CHEHARDY, Judge.
Plain tiff-appellant, Joseph Lazar, appeals from the judgment of the trial court dismissing his suit against Federal Insurance Company and Dr. James J. DiLeo for damages sustained as a result of alleged dental malpractice.
Plaintiff, on October 7, 1974, discussed with defendant Dr. DiLeo the installation of a permanent bridge for a removable partial. As a result of x rays taken on plaintiff's visit on October 14, 1974, Dr. DiLeo referred plaintiff to Dr. James Steiner, an endodontist, for possible root canal treat *720 ment. A root canal was done on the second molar on October 17, 1974. X rays taken before and after the root canal, as well as first x rays by Dr. DiLeo, did not disclose any abnormality of the lower left second molar. On October 25, Dr. DiLeo performed additional therapy on the bicuspid. On December 6, 1974, defendant dentist prepared plaintiff’s teeth for placement of a fixed bridge. On December 19, 1974, Dr. DiLeo could not install the permanent bridge because the bite was too high. A new permanent bridge made from a second impression taken on January 3, 1975, also failed to fit. On January 22, 1975, Dr. DiLeo installed the first bridge, which had been reworked. On January 30,1975, plaintiff returned to Dr. DiLeo complaining of pressure on the lower left second molar. Plaintiff was advised by defendant dentist that he could expect some discomfort — that this was normal after installation of a bridge. On this same day, Dr. DiLeo did a prophylaxis and a restoration to an upper bicuspid.
Plaintiff did not see Dr. DiLeo again until June 10, 1975. Plaintiff was seeking relief from pain which continued since his visit of January 30, 1975, but which plaintiff contends he accepted because he was assured by Dr. DiLeo that this pain was normal. On June 10, Dr. DiLeo adjusted the bite by spot grinding the bridge. No x rays were taken, but plaintiff was referred back to the endodontist, Dr. Steiner.
X rays taken by Dr. Steiner of the lower left second molar on July 2,1975, revealed a horizontal fracture of the distal root of the lower left second molar. (There is evidence that there was a microscopic fracture of this molar, even in October, 1974.) Infection was indicated in the area of the fracture.
Pursuant to the advice of Dr. Steiner, Mr. Lazar had the bridge removed by Dr. Russell Bond. Bone loss from the infection would not permit saving of the remaining half of the molar. It then became necessary to implant a gold post in plaintiff’s jawbone to act as a stanchion for that end of the permanent bridge. As a result, plaintiff had asked for medical and dental expenses, past and future, pain and suffering, mental anguish, physical injury, and disability in the total amount of $57,000.
The thrust of plaintiff’s case is that at the time of his initial visit, there was no fracture of the second molar; that the fracture and resulting injury to his mouth was ,a result of a too high bite in the bridge installed in January by Dr. DiLeo; and that despite his many complaints, Dr. DiLeo did nothing from January 1975 to June 1975 to correct the problem.
There is conflicting testimony regarding just what transpired between Mr. Lazar and Dr. DiLeo between January 10, 1975 and June 10, 1975. Mr. Lazar testified that on many occasions, by telephone and in person, he complained to Dr. DiLeo of the pain and discomfort, but was always advised that the pain was a normal result of the new bridge. Dr. DiLeo testified that on occasions plaintiff did state he had problems — “whether it was once or a hundred times, I don’t know, but I would say he probably made a gesture that he had a problem.” In response to whether or not Mr. Lazar told him about his problems at the New Orleans Athletic Club, Dr. DiLeo stated:
“Could have been any number of places because we travel. It might have been Las Vegas, Bourbon Street, at supper. We more or less crossed the same paths. Specifically didn’t have to be at the NOAC.”
Regarding complaints out of the office, Dr. DiLeo further testified:
“ * * * In other words, I don’t constitute that as a bona fide personal request for relief of a problem. * * *
* * * ⅜ * ⅛
* * * He was probably advised, not once, but every time he questioned me about a problem, I told him, 'Joe, I cannot take care of you here. My office is open to you at anytime you wish to come in. Let me correct the problem there,’ is indicated by the fact that if he had a problem from January 30, 1975, and I didn’t see *721 his physical being in my office until June 10th, he certainly couldn’t have been in too much distress.”
It was necessary for plaintiff to prove in a malpractice action based on the negligence of a dentist licensed under L.R.S. 37:751 that: (1) the degree of knowledge or skill possessed or the degree of care ordinarily éxercised by dentists practicing in the same community or locality to that in which the defendant practices; (2) the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have occurred.
In his reasons for judgment the trial judge observed:
“ * * * So, all told, as I view this testimony, this was an unfortunate circumstance that no professional fault can be laid upon any of the doctors. This very likely was, and I think now I have a right to express an opinion having heard all the testimony, this very likely was a microscopic fracture existing in the affected area that was there initially, but could not, by standards of detection, using the ordinary care and skill which doctors are charged under the law to exercise, be detected timely. And, unfortunately, it was one of those latent conditions that had a detrimental effect. But, certainly, not at the fault of any of these professional men.”
At one point in the testimony much is made about the “joke” incident — Mr. La-zar’s allegedly joking about not paying the doctor’s bill and failing to recall the incident. After being shown a document, purportedly in his handwriting, Mr. Lazar observed that “ * * * it looks like something I would have done, but I do not recall it. And Dr. DiLeo and I were on the basis that this would get a laugh.”
The court, upon being shown the document stated that it “ * * * is not impressed with this being anything more than a mere joke.” In his reasons for judgment the trial judge nonetheless indicated that in his making his credibility call in favor of Dr. DiLeo’s testimony regarding meetings between Mr. Lazar and Dr. DiLeo at the New Orleans Athletic Club he did give weight to the inconsistent testimony of Mr. Lazar regarding the “joke” incident.
The court is of the opinion that the evidence does not prove a lack of credibility on the part of plaintiff, Joseph Lazar, or Dr. DiLeo, as much as it indicates a failure to communicate. From reading the testimony it appears both men have told what they consider to be the truth. A reading of all of the judge’s reasons for judgment would indicate that he shares this view. He stated:
“ * * * There is only one shred of evidence upon which I can find a sufficient basis to acknowledge credibility. * * * I’m sure it was a jest because Dr. DiLeo said it was a jest. But the testimony is inconsistent. * * * ”
The reasoning of the trial court in reaching its factual conclusion we find to be thoroughly stated in the lengthy reasons for judgment. It is this court’s obligation to give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
For the foregoing reasons the judgment of the trial court is affirmed.

AFFIRMED.