CARMEN B. MEDINA SANTIAGO ET AL., demandantes y recurridos, *v.* DR. ALVAN VÉLEZ ET AL., demandados y recurrentes.

*Número:* RE-86-557 *Resuelto:* 26 de enero de 1988

*Edna Abruña Rodríguez*, abogada de los recurrentes; *Diego E. Mejías Montalvo*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante este recurso examinamos la sentencia que declaró con lugar una demanda contra un dentista por su negligencia en la aplicación de correas para inmovilizar y tratar a una niña ciega y con severa retardación mental. Revocamos al Tribunal Superior. La prueba no apoya la conclusión de que la actuación del dentista fue negligente.

I

Carmen Medina Santiago y Rosendo Aponte Santiago, por sí y en representación de sus hijos, presentaron demanda contra los Dres. Yilda M. Rivera, Luis Marini y Alvan Vélez por impericia médica causante, alegadamente, de los daños que sufriera su hija Carmen Milagros Aponte Medina de trece (13) años. Alegaron en la demanda que la niña fue referida a los dentistas por el Dr. Joseph Raub del Hospital de Niños y Adultos Lisiados para un tratamiento especial de profilaxis o limpieza, odontología restaurativa y extracciones. La niña tenía un historial médico de severa retardación mental y no veía debido a un glaucoma congénito. El referimiento indicaba que la niña era muy difícil de tratar (*management problem*), y se sugería que fuera intervenida bajo los efectos de anestesia general.

Los padres afirmaron que el doctor Vélez le hizo la limpieza de los dientes sin aplicarle anestesia general y que se le

fracturó el brazo derecho cuando utilizó correas especiales para inmovilizarla y vencer su resistencia al tratamiento dental, amén de proteger al dentista de cualquier agresión física. A su vez, reclamaron daños por sufrimientos y angustias mentales por la cantidad de $350,000.

El tribunal de instancia concluyó que "la falta de anestesia general en este caso, tomando en cuenta los hechos y circunstancias particulares del mismo y de la prueba presentada en su apoyo, no re[ú]ne o no satisface todos los requisitos de la teoría del riesgo o responsabilidad absoluta. . . . Tampoco quedó demostrado a nuestro entender que la aplicación de anestesia general fuera el uso y costumbre en el procedimiento o tratamiento a que fue sometida la menor". Apéndice, pág. 17.

No obstante, el tribunal concluyó que en vista del padecimiento de los huesos de la niña, y la decisión de no utilizar anestesia general, "este tipo de paciente demandaba el uso del camisón" en vez de correas como método de controlar los movimientos de Carmen Milagros. Finalmente determinó que ésta fue la causa de la fractura del brazo derecho y declaró que hubo negligencia en el manejo de la paciente. Procedió a fijar una indemnización correspondiente a ella y a sus padres por la suma de $17,500 más las costas y $3,000 en honorarios de abogados.

Ante nos acude el doctor Vélez y alega que la determinación de responsabilidad no está apoyada por la prueba vertida en el juicio. Cuestiona también la decisión del tribunal a quo de que la limpieza general de los dientes de la menor incapacitada requería una anestesia general o el uso de una camisa de fuerza para controlar sus movimientos.

 El recurso nos permite examinar la aplicación del derecho de daños a un área muy especializada y fronteriza de la odontología: el tratamiento de niños con incapacidad mental. Al pautar el derecho estamos conscientes de que nuestra

sociedad ha dado pasos impresionantes para incorporar a la comunidad a niños con impedimentos y para utilizar las técnicas más avanzadas en el tratamiento de sus enfermedades. *Bonilla* v. *Chardón*, 118 D.P.R. 599 (1987). Pero al considerar las circunstancias específicas de este caso también reconocemos "que la mano que cura no alcanza el grado de agravio social de la mano que hiere". Opinión disidente del Juez Asociado Díaz Cruz en *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375, 381 (1978).

## II

En Puerto Rico las normas mínimas de cuidado, de conocimiento y de destrezas requeridas a los dentistas son las mismas que el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, le impone a la profesión médica. *Guzmán* v. *Silén*, 86 D.P.R. 532 (1962); *Rodríguez Retamar* v. *Maldonado*, 100 D.P.R. 662 (1972). Por lo tanto, en vista de las normas pautadas en *Oliveros* v. *Abréu*, 101 D.P.R. 209 (1973), la atención requerida a los dentistas es aquella que, a la luz de los modernos medios de comunicación y conforme con los conocimientos de la ciencia, satisface las exigencias que la profesión ha establecido para el tratamiento de enfermedades iguales o parecidas. Véase *Ríos Ruiz* v. *Mark*, 119 D.P.R. 816 (1987). En el caso de un especialista se espera que tenga los conocimientos profesionales, así como las destrezas y competencias de los médicos o dentistas con la misma especialidad. Véanse, en general: 3 *Shepard's Causes of Action*, pág. 547 *et seq.* (1984); 3 *Speiser-Krause-Gans, The American Law of Torts* Sec. 15:50, pág. 542 *et seq.* (1986). Consúltense con fines comparativos: *Morrison* v. *Acton*, 198 P.2d 590 (1948); *Willson* v. *Kornegay*, 132 S.E.2d 791 (1963); *Simpson* v. *Davis*, 549 P.2d 950 (1976); *Donathan* v. *McConnell*, 193 P.2d 819 (1948); *Watkins* v. *Parpala*, 469 P.2d 974 (1970). También se exige del especialista que al atender al

paciente aplique sus conocimientos y destrezas con el grado de cuidado que se espera ejerza un profesional con su misma preparación. Véanse, en general: Nota, *Liability of Dentist to Patient*, 83 A.L.R.2d 7; Nota, *Standard of Care Owed to Patient by Medical Specialist as Determined by Local, "Like Community," State, National, or Other Standards*, 18 A.L.R.4th 603.

■ Para establecer prima facie un caso de daños y perjuicios por negligencia de un médico o un dentista, el demandante tiene: (1) que presentar prueba sobre las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) que demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa de la lesión sufrida por el paciente. *Rodríguez Retamar* v. *Maldonado*, supra; *Lazar* v. *Federal Ins. Co.*, 380 So. 2d 719 (1980); *Fitzgerald* v. *Manning*, 679 F.2d 341 (1982); *Luna* v. *Nering*, 426 F.2d 95 (1970); *Pisel* v. *Stamford Hospital*, 430 A.2d 1 (1980); *Morrison* v. *MacNamara*, 407 A.2d 555 (1979); *Wiley* v. *Karam*, 421 So. 2d 294 (1982); *Dunham* v. *Elder*, 306 A.2d 568 (1973); *Wallace* v. *Garden City Osteopathic Hospital*, 314 N.W.2d 557 (1982).

■ Como en todo caso de impericia médica, se presume que el dentista ejercitó un cuidado razonable en el desempeño de sus funciones. *Rivera* v. *Dunscombe*, 73 D.P.R. 819, 838 (1952); *Ramos Orengo* v. *La Capital*, 88 D.P.R. 315, 328 (1963). La ocurrencia del accidente por sí solo no constituye la prueba necesaria para la negligencia. Como un médico o un dentista no puede garantizar un resultado favorable en toda intervención, el fracaso del tratamiento prescrito o en el diagnóstico no constituye por sí una actuación negligente.

■ Corresponde al demandante establecer mediante prueba pericial —salvo que la falta de cuidado sea tan evidente como para inferir negligencia, *Quiñones* v. *Duarte Mendoza*, 112 D.P.R. 223, 225 (1982)— cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de determinado tipo de pacientes. La prueba debe demostrar cuáles son las exigencias de toda la profesión a la luz de los conocimientos científicos disponibles mediante los medios de comunicación y programas de educación continuada utilizados por los dentistas. Véanse, en general: 3 *Speiser-Krause-Gans, The American Law of Torts, op. cit.*, Sec. 15:50, pág. 542; 3 *Shepard's Causes of Action, op. cit.*, Sec. 31, pág. 599; R.M. Gerughty y A.P. Wilkinson, *Negligence in Everyday Dentistry*, 17 (Núm. 6) Trial 27, 28 (junio 1981); *Medical Malpractice— The Necessity of Expert Testimony and The Use of a General Physician as an Expert Witness in a Malpractice Action Against a Specialist*, 10 Ohio N.U.L. Rev. 37 (1983); *Willard* v. *Hagemeister*, 175 Cal. Rptr. 365, 369 (1981).

A la luz de este trasfondo doctrinal analizaremos la controversia ante nuestra consideración.

### III

Primeramente, debemos determinar si los demandantes pusieron al tribunal en condiciones de precisar cuáles son las normas mínimas aplicables en el tratamiento de niños con severa retardación mental, para entonces evaluar el tratamiento ofrecido por los demandados. Un examen cuidadoso de los autos originales así como una lectura de toda la transcripción de la evidencia y la prueba documental sometida, revela que los demandantes no aportaron la evidencia necesaria para probar que los dentistas actuaron negligentemente. Del testimonio pericial y la prueba documental que obra en autos se desprende que el doctor Vélez utilizó uno de

los métodos aceptados para controlar a los niños con severa retardación mental y que presentan problemas de manejo en el tratamiento.

Por la parte demandante testificaron los padres, la hermana de la menor y el Dr. Juan José Félix, cirujano ortopédico. También se sometió una deposición que se le tomó al doctor Raub, quien refirió a la menor a los dentistas. Sin embargo, los demandantes no presentaron prueba pericial ni documental para acreditar las exigencias modernas de la odontología en el tratamiento de niños con retardación mental. Tampoco presentaron prueba sobre los diversos métodos utilizados por los dentistas para controlar niños problemáticos o agresivos. Véase, por ejemplo, T. Bowers, *Behavior Management and Liability of Dentists: Children and the Hand-Over-Mouth Exercise*, 89 Dick. L. Rev. 381 (1985).

## A

De la transcripción de la prueba y los autos surge que la menor era paciente del Hospital de Niños y Adultos Lisiados y compareció a esa institución para procurar atención médica y odontológica. El Dr. Joseph Raub, dentista pediátrico, la atendió en la institución, pero por la condición de la niña la refirió a los doctores Rivera, Marini y Vélez en sus oficinas particulares.

Aunque el doctor Raub no testificó, la parte demandante presentó la transcripción de su deposición. Esta prueba, sin embargo, fue de escaso valor probatorio, pues el doctor Raub no recordó los detalles de su referimiento a los dentistas. Tampoco tenía información que ayudara al tribunal a determinar las normas mínimas observadas por los odontólogos al atender a niños con impedimentos. La prueba documental revela que en el referido se informó que la niña tenía una retardación mental y glaucoma congénito. Aunque él acompañó copia de la última evaluación hecha en el Hospital

de Niños y Adultos Lisiados, no advirtió expresamente en el referido que la niña padecía de "osteogénesis imperfecta", condición de fragilidad en los huesos.

En la primera visita a las oficinas de los dentistas, la menor fue atendida por la Dra. Yilda Rivera, quien la examinó y le dio cita para hacerle una limpieza general y extraerle unas muelas. En la segunda ocasión la atendió el doctor Vélez. El dentista controló los movimientos de la menor sujetándola a la silla dental con unas correas dispuestas alrededor de las manos, las piernas y el cuerpo. Con anestesia local procedió a sacarle las muelas. Concluida esta intervención, separó fecha para la limpieza general.

En esa tercera ocasión con la ayuda de la madre y una ayudante del doctor, y luego de inmovilizarla con las correas, se le hizo la limpieza general de la dentadura. La señora Medina Santiago testificó que al concluir la limpieza ella levantó a la niña y la puso en la silla de ruedas. La llevó al automóvil donde la esperaba su esposo y regresó a la oficina de los dentistas para separar otra cita de seguimiento.

Aunque en ese momento no le indicó al doctor Vélez que su hija tuviese una lesión, la madre de la menor testificó que al colocar a la niña en el automóvil notó que tenía el codo hinchado. Entonces, la llevó a tomarse unas radiografías del brazo. Aunque las placas se le extraviaron, la señora Medina admitió que el radiólogo no encontró lesión en el brazo. Sin embargo, al otro día se repitieron las radiografías y se halló una fractura en el brazo derecho de la niña que requirió la intervención de un cirujano ortopeda, el Dr. Juan José Félix.

Por su parte, el doctor Félix testificó que la niña sufrió una "fractura desplazada de la unión del tercio medio con el tercio superior del húmero derecho", causada por una presión excesiva sobre esa extremidad. Sin embargo, como no estaba familiarizado con el tratamiento dental de niños con

retardación mental, no explicó si había relación entre la fractura de la menor y las correas utilizadas para controlarla.

## B

Frente a esta prueba tan escasa y poco ilustrativa de los requisitos profesionales para el cuidado de estos niños problemáticos, la parte demandada ofreció el testimonio de varios peritos, aportó amplia literatura médica sobre odontología pediátrica y presentó una interesante película sobre las técnicas disponibles para el manejo de niños con impedimentos.

Por los dentistas testificó el Dr. Alvan Vélez, profesor de odontopediatría en la Escuela de Odontología del Recinto de Ciencias Médicas de la Universidad de Puerto Rico. Debido a su extenso entrenamiento y práctica con niños con retardación mental, el doctor Vélez fue contratado por el Hospital de Niños y Adultos Lisiados para atender a niño⁻ impedidos.

El doctor Vélez describió que conforme a la mejor práctica de la odontopediatría la menor fue evaluada tanto por él como por la doctora Rivera para determinar si procedía la hospitalización y aplicación de anestesia. Citando del tratado médico del profesor Finn titulado *Clinical Pedodontics*, Philadelphia, W.B. Sanders Co., 1973, el doctor Vélez explicó los criterios aceptables para la determinación del uso de anestesia general al tratar a un paciente con impedimentos:

"La Anestesia General puede ser usada en el manejo de niños impedidos cuando: (1) el impedimento físico mental es suficiente que [sic] no nos va a dejar si el paciente no coopera; [(2)] [in]tentos se han hecho para hacer el trabajo dental, pero satisfactoriamente no se puede seguir por su problema sicológico o su problema de comportamiento; [(3)] pacientes con problemas congénitos del corazón que son cianóticos o que están sintomáticos, la ansiedad que le produce y le puede causar más daño; [(4)] pacientes que necesitan anestesia, pero que la infección que tienen no se de . . . [sic] no se puede usar

anestesia regional; [(5)] pacientes que tienen un impedimento moderado y necesita[n] trabajo dental extensivo y que va a ser muy dificultoso llevarl[o] a cabo en visitas en la oficina."

P. Específicamente hablando sobre este caso, ¿la paciente reunía alguno de esos requisitos que requerían anestesia general en esos supuestos que explica . . . ?

R. El paciente aquí, pues, no es un "mild" no es un caso moderado de impedimento, es un caso severo con múltiples impedimentos. O sea, yo creo que una de mis decisiones por la cual yo usé mi criterio de no llevarla a sala de operaciones. T.E., Núm. 2, págs. 141–142.

Para ilustrar las técnicas de manejo de niños impedidos se exhibió la película *Techniques for Managing the Handicapped Child in the Dental Office* producida por el Departamento de Odontopediatría del Colegio de Dentistas de la Universidad de Tennessee. La película ilustra los diferentes mecanismos utilizados por los dentistas para controlar a pacientes con retardación mental. Entre éstos se destaca el uso de correas alrededor de las manos, el pecho y las piernas. Según la narración de la película, el método utilizado dependerá de la preferencia personal del dentista y del tipo de retardación:

Estos aparatos para limitar el movimiento vienen para utilizarse alrededor de los brazos, del estómago, del pecho, las rodillas y los tobillos de los pacientes. Tienen la ventaja de que, de ser necesario, pueden soltarse rápidamente para liberar al paciente. Aunque existen varios tipos de aparatos bastante efectivos para limitar el movimiento, los cuales se pueden adquirir comercialmente, algunos dentistas prefieren usar aparatos fabricados por ellos mismos los cuales se ajustan a sus necesidades. . . . La preferencia personal y el éxito obtenido por cada individuo con uno de estos aparatos en particular es lo que determina cuál va a utilizarse y de qué manera. El método mediante el cual se amarra el aparato que limita el movimiento a la muñeca del paciente y luego al brazo de la silla es particularmente efectivo cuando se utiliza con-

juntamente con otros de estos aparatos colocados alrededor de la cintura y de las piernas del paciente.

. . . El movimiento de la cabeza se puede controlar eficazmente sujetando ésta firmemente entre el brazo del operador y su cuerpo y se le puede abrir la boca al paciente con los dedos de la mano izquierda. Debemos hacer hincapié en el hecho de que en todos los casos en que se limiten los movimientos de un paciente cualquier tipo de presión que se aplique sobre éste nunca debe ser suficiente como para causarle daño. Solamente se le aplicará presión al paciente en aquellos casos en que sea necesario para darle al operador la oportunidad de trabajar sin tener que sujetar físicamente al paciente.

La película sometida en evidencia ilustra dramáticamente las dificultades a que se enfrenta un dentista especializado en un área en las fronteras de su profesión: el tratamiento de niños con impedimentos. Éstos requieren un grado de sensibilidad, paciencia, conocimiento y peritaje que pocas otras especialidades exigen. Reconocemos, además, la importante contribución social de estos profesionales en la aplicación de las técnicas odontológicas modernas a este sector anteriormente marginado. Aunque no estamos ajenos al dolor que sufren los padres y los niños con impedimentos cuando ocurre un daño, nuestra función exige una adjudicación justa e imparcial. Al cumplir con esta tarea indelegable "tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo". *Pérez Torres* v. *Bladuell Ramos*, 120 D.P.R. 295, 298 (1988).

El doctor Vélez describió detalladamente cómo utilizó correas de quince pulgadas de largo y cuatro de ancho. Explicó que utilizó el mismo sistema de correas las dos veces que atendió a la niña, aplicándolas alrededor de los brazos, muñecas y las piernas, y que la mamá de la menor le aguantó la cabeza. Informó que en ambas ocasiones la niña lloró y movió

la cabeza. En la tercera visita hizo la limpieza "por cuadrante" con descansos periódicos.

Por los demandados también testificó el Dr. Jorge Fernández Pabón, odontólogo con una subespecialidad en niños. Explicó que debido a los altos riesgos de una anestesia general, ésta no es recomendable en el tratamiento dental de niños, especialmente en la profilaxis o limpieza oral.

Finalmente, testificó el Dr. Guillermo Jordán, cirujano ortopeda, quien describió detalladamente los riesgos de someter a un paciente con osteogénesis imperfecta a anestesia general:

> R. Sí. Hay una serie de razones por las cuales estos pacientes mientras sea posible no deben, bajo ninguna circunstancia, llevarse a Sala de Operaciones. Primero, como dije anteriormente, la fragilidad de los huesos, no se limit[a] solamente a los huesos de las extremidades, sino también ahí está inclu[i]do la mandíbula, está inclu[i]do las vértebras cervicales y cualquier otro hueso del cuerpo, y siempre se va a dar una anestesia a un paciente de estos para poder introducir el tubo endotraqueal. Para darle anestesia a estos pacientes hay que manipularle el cuello hiperextenderlo para linear la tráquea con el tubo que uno va a introducir. Y este es un movimiento que hay que hacerlo con sumo cuidado porque puede fracturar, tanto mandíbula como vértebras cervicales. Y una fractura de vértebras cervicales en un niño de estos, pues, es una condición de mucho cuidado y puede ocasionarle la muerte. T.E., Núm. 3, pág. 53.

Ante este dramático relato de los riesgos de la aplicación de anestesia general en un procedimiento rutinario de limpieza, y examinada la totalidad de los testimonios y la prueba documental, procede la revocación de la sentencia del tribunal de instancia. Cualquier otra conclusión es contraria al derecho vigente. Los demandantes recurridos no demostraron que el doctor Vélez incumpliera con las normas aceptadas para el tratamiento de este género de pacientes. *Se*

*expide el auto y se revoca la sentencia del tribunal de instancia.*

El Juez Asociado Señor Negrón García disiente con opinión escrita a la cual se une el Juez Asociado Señor Ortiz.

—O—

Opinión disidente del Juez Asociado Señor Negrón García a la cual se une el Juez Asociado Señor Ortiz.

"El sentido común ha de servirnos de antídoto contra el falso sentido jurídico, y, generalmente, de guía segura para distinguir entre el verdadero y el falso sentido jurídico. Cuando un resultado es rotundamente contrario al sentido común, ha de obedecer a un error jurídico; debe, por tanto, ser corregido. No se trata de poner el sentido vulgar sobre el sentido jurídico, sino de contrastar lo que parezca fruto del sentido jurídico con lo que, por sentido común, es realidad evidente."[1] J. Vallet de Goytisolo, *La Misión del Notario*, 16 Rev. Der. Not. 393, 409 (1957).

Con esta perspectiva en mente, disentimos de la opinión del Tribunal que exime de responsabilidad al Dr. Alvan Vélez Colón. Expongamos los hechos según depurados por el filtro judicial del foro de instancia.

I

Carmen Milagros Aponte Medina es una niña incapacitada desde su nacimiento. Padece parálisis cerebral-hipotó-

---

[1] "La práctica de la medicina requiere, en el diagnóstico y en el tratamiento, que el facultativo llegue a juicios y tome decisiones. Hay en ese proceso un inevitable elemento subjetivo. También, la relación de médico y paciente es, o deber ser, única para ambos. Un médico tiene más de un paciente; posiblemente atiende en un mismo día a más de un paciente que sufren una misma enfermedad, pero la relación con cada uno es única porque trata con seres humanos y no con máquinas. La constitución física de cada ser humano es distinta, como lo es su sicología y su idiosincracia." *Oliveros* v. *Abréu*, 101 D.P.R. 209, 227 (1973).

nica, glaucoma congénito con ceguera, retardación mental severa y osteogénesis imperfecta. Era paciente del Hospital de Niños y Adultos Lisiados. Durante varios años recibió tratamiento médico, incluso odontológico, en esa institución. Entre los dentistas que la atendieron estaba el pedodoncista Dr. Joseph R. Raub Hernández. El 16 de octubre de 1980, éste la refirió para evaluación y tratamiento consistente en profilaxis, rehabilitación oral restaurativa y extracciones, a las oficinas de los Dres. Alvan Vélez Colón, Luis A. Marini Mier y Yilda M. Rivera Nazario, especialistas en pedodoncia. Estos galenos tenían un contrato con el Departamento de Salud en virtud del cual atendían niños incapacitados referidos por el Departamento.

En su comunicación, el doctor Raub Hernández enfatizó que Carmen Milagros presentaba un problema de manejo (*management problem*) y recomendó —al igual que en otros casos— que su evaluación y tratamiento fuera en Sala de Operaciones bajo anestesia general, para lo cual existían fondos federales. Acompañó copia de la última evaluación realizada en el Hospital de Distrito Universitario —de 9 de octubre de 1980— en que se indicaba el padecimiento de "osteogénesis imperfecta". T.E., Vol. III, págs. 8-9. Según su deposición, el doctor Raub Hernández refirió a Carmen Milagros por considerarlo un caso difícil que podía ser mejor atendido bajo anestesia *general*. El doctor Vélez Colón y sus asociados eran los únicos que así lo hacían en la sala de operaciones de un hospital. Claro está, la determinación final de si ella podía ser admitida en sala bajo anestesia *general* correspondía al anestesiólogo, previa evaluación propia del historial médico y físico de la paciente. El doctor Raub Hernández categóricamente afirmó que, en la alternativa, y más allá del "problema de manejo" de Carmen Milagros, hubiese tratado de hacer la limpieza bajo anestesia *local*. Dep., pág. 42.

Así referida, Carmen Milagros fue atendida en tres ocasiones. En la primera, el 24 de octubre de 1980, fue evaluada por la doctora Rivera Nazario. Con el beneficio del récord médico, un examen y rayos X, recomendó tres extracciones, restauraciones y limpieza dental.

El 30 de octubre fue la segunda visita. La atendió el doctor Vélez Colón. Éste descartó la anestesia general. La inmovilizó mediante su sistema, consistente de unas abrazaderas puestas alrededor de la muñeca, el antebrazo y un poco más abajo de la rodilla. La madre de la menor, Sra. Carmen Medina Santiago, le aguantaba la cabeza por razón de los movimientos laterales incontrolables debido a la parálisis cerebral. El doctor Vélez Colón le aplicó un *spray* y después le puso la inyección de anestesia local. Realizó así tres (3) extracciones de unos dientes irreparables. Durante el corto proceso Carmen Milagros estuvo un poco inquieta y lloró.

El 6 de noviembre de 1980 fue la tercera visita. El doctor Vélez Colón volvió a atenderla. Debido a que tenía mucha materia de cálculo y la boca estaba muy sucia, estimó pertinente hacerle una profilaxis bucal y limpieza "supra gingival" —más arriba de las encías— antes de proceder a hacer ningún otro tipo de restauración. Según el propio doctor Vélez Colón, el mismo sarro podía "esconder debajo alguna carie que no se ve. Ella tenía tanto que había que limpiar que a[u]n siendo uso y costumbre de la oficina de dar la limpieza como último, debido a su condición oral decidió darle la limpieza en ese momento para ver que bajo ese sarro no hubiera alguna otra carie debajo".

Para este tratamiento utilizó el mismo sistema de correas abrazaderas en la muñeca, el brazo y las piernas. La paciente fue asistida por personal de la oficina y la madre, señora Medina Santiago, quien le sostenía la cabeza. La limpieza la realizó con una máquina de ultrasonido (Cavitrón) que utiliza mucha agua y acelera el tiempo que toma el procedimiento.

Una asistente sostenía el abridor de boca y succionaba el agua. El procedimiento duró alrededor de media hora. Durante el mismo, la niña estaba en la silla dental en posición acostada. Lloraba y movía mucho la cabeza. El doctor Vélez Colón, a intervalos, la dejaba descansar y volvía a limpiar un cuadrante. Repitió esta operación hasta completar los cuatro (4) cuadrantes.

El testimonio, por voz de su madre, la señora Medina Santiago, describe cómo el doctor Vélez Colón trabajaba por el lado derecho de la nena. Estaba parado, no sentado. La silla dental en forma de camilla estaba bajita. La niña se movía mucho. T.E., Vol. I, págs. 66–67. Expone así cómo, a su juicio, ocurrió la fractura: "Con las dos manos porque la nena siempre se movía y ahí fue cuando él la cogió por aquí, la apretó así, fue que la echó bien para atrás así, ahí fue que él le fracturó el bracito a la nena." T.E., Vol. I, pág. 68. De modo más amplio, escuchemos su testimonio original:

La tercera. Pues, la tercera vez él acostó la nena, la aguantó, me dijo que se le aguantara por la cabecita, así, y una señora que estaba, que él me pre . . . yo . . . el . . . no era la enfermera, yo no la conocía, tenía que ser secretaria y empezó la nena a llorar. Entonces, yo le dije que la dejaran porque la nena estaba llorando mucho y que la nena le pusieran anestesia porque él dijo, según el referido, había que ponerle anestesia. *Y él me dijo que no, que no era necesario la anestesia.* Pero la nena siguió llorando y llorando mucho y *él a la fuerza le hizo el* tratamiento, *la apretó muy duro por aquí a la nena.* Y yo la tenía aguantadita por la cabeza, la otra señora la tenía aguantada por los pies, además, le tenían una correa en el medio, en la cintura, *pero toda la fuerza la estaba haciendo él, el Dr. Alvan Vélez.*

P. El Dr. Alvan Vélez. ¿Qué pasó, si pasó algo, cuando la niña comenzó a quejarse, dona Carmen?

R. Yo le dije al doctor que la dejara. Yo le dije: "Doctor, déjela, déjela, porque la nena está llorando mucho. Está llorando mucho y está sufriendo sola. Está sufriendo mucho, déjela, no me le haga más nada que yo no la quiero ver sufriendo

así." Pero él siguió y dijo: "No, porque había que terminarle el trabajo." Y yo le dije: "No, no démela, démela." Y ya a lo último, pues, después que le hizo todo el trabajo, pues, me dijo: "Ya se la puede llevar." Cuando yo la cogí, que la pasé de la camilla a su silloncito de ruedas, la nena siguió llorando mucho y llorando mucho. Pero cuando yo la saqué afuera el papá me dijo, de la nena, que andaba también, [*sic*] me dijo: "La nena sigue y está llorando mucho." Y yo le dije: "Llévatela." Entonces, cuando nos fuimos a montar en el carro el papá, *yo le vi el codito hinchado de la nena,* y él dijo: "La nena tiene el codito hinchado, a lo mejor le han fracturado ese bracito." Y yo le dije: "No, no puede ser." Pero que yo le dije que sí, *"la nena la apretaron mucho."* Entonces, cuando yo le dije: "No." El me dijo: "Vamos a virar." Y yo le dije: "No, porque ellos son especialistas de la boca, no son pediatras ni médicos generalistas, yo la llevo donde el Dr. Ramírez." La llevé donde el Dr. Ramírez, como es un segundo piso no podíamos subir la escalera. Yo le conté al . . . subí arriba yo, le conté al doctor, me dio un referido para que le sacara una placa. (Énfasis suplido.) T.E., Vol. I, págs. 13–14.

El referido del doctor Ramírez fue al Dr. Pedro Félix Reyes, cirujano ortopeda. Éste atendió a Carmen Milagros al día siguiente, 7 de noviembre. Encontró una fractura "desplazada de la unión del tercio medio con el tercio superior del húmero derecho". T.E., Vol. II, pág. 8. En la misma, el músculo deltoides se retrotrajo con *violencia,* susceptible de posiblemente ser producida por el tipo de restricción que se le impuso a la niña en la silla dental y a la violencia con que se movió si no estaba sedada. T.E., Vol. II, págs. 10–11. También atestó que era posible —según la cantidad de presión— que pudiera haberse producido al estar la niña amarrada, el dentista levantar su rodilla y colocarla encima de ese hueso y reclinarla hacia atrás para mantenerla quieta. Se basó en que "aquí hubo, aquí esta fractura, esta fractura es una fractura en la cual el músculo deltoides se retrajo con *violencia. . . . En la posición inferior estaba quieto. El músculo*

*deltoides se llevó al fragmento superior"*. (Énfasis suplido.) T.E., Vol. II, pág. 15.

En virtud de ésta y la restante prueba, el ilustrado foro de instancia encontró probada relación causal entre el tratamiento y la fractura, y que el doctor Vélez Colón incurrió en responsabilidad al aplicar y usar con la menor Carmen Milagros un método de inmovilización inadecuado e inseguro.

## II

Revisamos esta sentencia a solicitud del doctor Vélez Colón. Un examen de la prueba documental y testifical nos mueve a resolver que sus señalamientos no tienen méritos. Aduce que el foro de instancia determinó erróneamente que el tratamiento tenía que hacerse bajo uso de anestesia general. La hipótesis es equivocada. Dicho tribunal descartó su uso por no habérsele demostrado que esa fuera la práctica aceptada, en particular si se toma en cuenta que la prueba reveló que por la condición de "osteogénesis" era contraindicado la anestesia *general*. Conllevaba unos altos riesgos de causar fracturas. T.E., Vol. III, págs. 10–12.

Aclarado este extremo, notamos que el dictamen de responsabilidad está predicado en la existencia, más allá de un simple *error honesto de juicio médico*, como pretende ver la opinión de este Tribunal. Está apuntalado en que el doctor Vélez Colón optó por utilizar su técnica de las correas, conociendo o debiendo conocer (debió prever) que por la naturaleza del tratamiento, los movimientos y la condición de osteogénesis de Carmen Milagros, la forma de su intervención y la fuerza generada podían causarle la fractura del brazo. Si bien al "médico se le reconoce amplia discreción profesional en su trabajo; no es responsable de mala práctica cuando se enfrenta a una situación en la cual cabe duda educada y razonable sobre cuál debe ser el curso a seguir" (*Oliveros* v. *Abréu*, 101 D.P.R. 209, 228 (1973)), "[n]o puede considerarse

*razonable* un tratamiento que somete a un paciente a riesgos innecesarios y previsibles, cuando se cuenta con medios alternos para evitarlos o disminuirlos". (Énfasis en el original.) *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719, 740–741 (1983). Véase *Vda. de López* v. *E.L.A.*, 104 D.P.R. 178 (1975).

La prueba estableció que para las autoridades médicas existen varios mecanismos de control para el ejercicio de la discreción profesional en orden a las circunstancias particulares de cada paciente. Bajo estas opciones, aunque limitadas, la obligación del médico es seleccionar la más adecuada para realizar el tratamiento y evitar causar daño innecesario.

En el caso de autos —debido al conocimiento de la condición de osteogénesis— todos los peritos coincidieron en que el uso de la anestesia general estaba contraindicado y presentaba riesgos mayores. Ante esta duda, el doctor Vélez Colón usó sabiamente su discreción profesional. Sin embargo, incurrió en responsabilidad al descartar el uso de anestesia *local* o regional y los otros métodos de sujeción que reducían las posibilidades de una fractura. Después de todo, era evidente que estaba ante una paciente que, debido a su compleja condición de *parálisis cerebral hipotónica, retardación mental, glaucoma congénito y ceguera, osteogénesis imperfecta y comportamiento problemático (management problem)*, ameritaba apartarse de la rutina.

Contrario a su proceder, el examen de la película ofrecida en evidencia como parte del peritaje[2] ilustra varias alternativas más seguras de restricción para el tratamiento dental en casos difíciles de niños impedidos (sábana inmovilizadora y banda frontal). C. Poland III y W. Bailey Davis, en el capítulo referente a *Los Problemas Dentales del Niño Incapaci-*

---

[2] *Techniques for Managing the Handicapped Child in the Dental Office*, Produced for the University of Tennessee College of Dentistry, Department of Pedodontics—James P. McKnight, D.D.S., Chairman.

*tado* nos remiten a la técnica de la sábana descrita por Mink y Hughes, desarrollada durante la década de 1960 como muy efectiva. Además, mencionan el uso de la envoltura pediátrica (*pedi-wrap*), que se usa rutinariamente en las salas de recuperación de los hospitales en niños que despiertan de anestesia general. R. McDonald y D. Avery, *Dentistry for the Child and Adolescent*, St. Louis, C.V. Mosby Co., 1978, págs. 493–494. Véanse, además, Palmi Moller, *Treatment of the Handicapped Child*, en Finn, *Clinical Pedodontics*, Philadelphia, W.B. Sanders Co., 1973, págs. 562–589; E.M. Wilkins, *Clinical Practice of the Dental Hygienist*, Philadelphia, Lea & Febiga, 1971, págs. 391–419.

Aun así, el Dr. Alvan Vélez en todo momento se empeñó en no usar anestesia local; atestiguaba que las limpiezas se efectúan sin anestesia cuando son simples y corrientes. ¿Puede sostenerse esta afirmación en este caso cuando él mismo adelantó el momento para la labor de la profilaxis debido al mucho cálculo que tenía la niña? Preguntado por qué no usó anestesia local, atestó estar convencido de que ella corría riesgo de sufrir una fractura. T.E., Vol. III, pág. 14. La posición es insostenible. Contrasta notablemente con su uso, una semana antes, en ocasión de haberle extraído tres dientes primarios. ¿Por qué, entonces, no le aplicó la anestesia tópica para aminorar la reacción al dolor o posible sensación de ahogo o incomodidad adicional a la *normal* de Carmen Milagros? Ciertamente no había contraindicación alguna para la anestesia local. Con ese paleativo razonablemente habría obtenido los mismos resultados positivos anteriores y logrado controlarla adecuadamente. Ese deber de previsión peculiar, propio de especialista, fue omitido. Era anticipable la combinación resultante del dolor de la labor de limpieza, la restricción de correas unido a las reacciones, la resistencia y los movimientos involuntarios constantes inducidos por la parálisis cerebral. Ante la ceguera de Carmen

Milagros, terror debió causarle el constante ruido ensordecedor y el chorro de mucha agua provenientes de la operación de la máquina de Cavitrón.

Sobre el uso de anestesia local, en una condición de boca "muy sucia, mucho sarro", el Dr. Jorge J. Fernández Pabón, perito del doctor Vélez Colón, aclaró al juez:

> R. Podría usarse. Inclusive, *podría utilizarse* para un procedimiento en donde se envuelven las encías un *tipo de anestesia local,* dependiendo de cuál sea la naturaleza . . . *la magnitud del problema.*
>
> P. Al decir usted "la magnitud del problema", sería cuestión de que el médico, el dentista al apreciar pudiera considerar de que una parte pueda ser más sensible que otra.
>
> R. *Correcto.* O sea, en una profilaxis puede fluctuar desde el equivalente a cepillarse los dientes hasta *el equivalente de remover el depósito calcáreo en las estructuras subingivales de los dientes.* O sea, en las raíces, donde ya está subingival donde al intervenir clínicamente, pues, *es prácticamente inevitable lastimar la encía y puede resultar, inclusive, la propia estructura calcificada del diente, la raíz, como todos sabemos, puede resultar sumamente sensitiva.* Y en ese caso, y esto *principalmente* en adultos, naturalmente, muy poco común en niños *porque no se da con frecuencia esa magnitud del problema en niños,* pero sí en adultos es muy, muy . . . no quisiera decir frecuente, pero *sí se puede encontrar con relativa frecuencia el caso en que sea necesario o sea conveniente* o deseable porque la anestesia en ese caso es estrictamente con propósitos de *evitar incomodidad* al paciente. (Énfasis suplido.) T.E., Vol. III, págs. 85–86.

La condición de la niña, su constante movilidad y débil constitución ósea requerían el mayor grado de cuidado y circunspección en el tratamiento. La opinión del Tribunal proyecta la impresión —como premisa inarticulada— de que era inevitable la fractura. También, inintencionalmente, da la sensación de que la ingente labor médica que realizan el doctor Vélez Colón y sus colegas con niños incapacitados debe ser protegida a ultranza con una norma judicial laxa. Discre-

pamos. Se trata de especialistas particularmente entrenados para casos difíciles. El de Carmen Milagros, como caso único y peculiar, imponía al doctor Vélez Colón el deber de agotar los mecanismos preventivos a su disposición para reducir esa probabilidad resultante de su conocida condición de los huesos. Como especialista estaba llamado a combinar toda su experiencia y técnica en protección de su frágil estructura ósea. Estaba consciente del problema. *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983). Aun así, optó por sólo usar las correas de cintura y piernas, sin la sábana inmovilizadora y la banda frontal. Más aún, descartó injustificadamente la anestesia local.

Su negligencia la resumió así el foro de instancia:

No podemos olvidar el hecho que la menor padece de osteogénesis imperfecta. Esta enfermedad se caracteriza por una fragilidad extrema de los huesos. De hecho la madre testificó sobre fracturas ocurridas anteriormente y la hermana también declaró que en ocasiones anteriores la niña había tenido fractura y había estado enyesada. Esta enfermedad, conocida por el dentista, *es una condición para él esmerarse en el tratamiento a realizarse en evitación de las fracturas que podrían ocurrir fácilmente en ese tipo de pacientes.*

. . . . . . . .

. . . En el caso que nos ocupa, ["como marco de referencia sobre los métodos disponibles"] hay un hecho que si por un lado ayuda por el otro crea ansiedad. Ese hecho es que la menor es ciega de nacimiento. Ese hecho hace que la niña no se impresione adversamente al mirar los equipos en el despacho del dentista. *Al contrario, al ser ciega, pero no sorda, es indudable que durante el proceso de limpieza le provocara gran ansiedad y se aumentara su natural intranquilidad.* El que más y el que menos le han hecho una limpieza en los dientes e indudablemente causa gran impresión no sólo los diferentes cepillos y pinzas que siente uno en las encías sino también *el zumbido de la alta velocidad que generan estos instrumentos.*

Tenemos que considerar que una persona sometida a cualquier tipo de sujeción a la que se sometiera a la menor podría

resultar en una fractura ya que se desarrolla una oposición que normalmente ejerce toda persona que en una forma u otra queda atado. La niña fue atada a la silla del dentista, tanto por brazos como por rodillas. Además de esa sujeción una persona le sujetaba los pies para evitar que se levantara. La madre sujetaba la cabeza. *Este tipo de paciente demandaba uso del camisón que, entre muchos métodos, se observaron en la película "Dental Treatment For The Handicapped". La fragilidad de los huesos de la niña, al ser ciega, el no haberse usado anestesia local o regional surge con meridiana claridad el caso de una niña inquieta ("Management Problem") que al verse obligada a permanecer quieta por un tiempo más extenso que lo usual, se desesperó y empezó a moverse para liberarse de la situación que ya no le era aceptable.* (Énfasis suplido.) Sentencia de 16 de mayo de 1985, págs. 18–20.

El deber de previsión "no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino a aquel *que es probable que suceda* y que llevaría a una persona *prudente* a anticiparlo. En suma, la mítica pero indispensable figura del 'hombre prudente y razonable' define la norma de conducta, y el [médico] será responsable si ocurre un daño que en las *particulares circunstancias* del caso pudo razonablemente haberse previsto y evitado". (Énfasis suplido y escolios omitidos.) *Hernández* v. *La Capital*, 81 D.P.R. 1031, 1038 (1960); *Salvá Matos* v. *A. Díaz Const. Corp.*, 95 D.P.R. 902 (1968).

Ante el cuadro fáctico expuesto, creído por el tribunal de instancia, ¿puede seriamente sostenerse que "la prueba no apoya la conclusión" de negligencia? La sentencia debió confirmarse. La misma mantenía "el fino balance que debe guiar la aplicación del estándar de prueba en la relación causal: ni excesiva rigidez que impida probar una reclamación válida por la imprudencia profesional del médico ni la laxitud que abre las puertas a la especulación y la conjetura". *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 223 (1978). Roto ha quedado ese balance. Hoy, en el caso de autos, hemos con-

vertido la norma de la *mítica* del médico prudente y razonable en una *mística* de médicos. Ese curso decisorio es peligroso. Debemos ser cuidadosos. Después de todo, el "'sentido de justicia, o sea, el sentido jurídico, es siempre el que pone los límites: es preciso guardarse de aquellas consecuencias, que, aun deducidas en buena lógica, aparezcan como *repugnantes a la justicia*'". (Énfasis suplido.) Biondo Biondi, citado por J. Vallet de Goytisolo, *La Misión del Notario*, XVI Rev. Der. Not. 410 (1957).