# 2001 DTA 158

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL VI DE CAGUAS/GUÁYAMA/HUMACAO**
**PANEL SUSTITUTO**

ISMAEL SANTANA, WANDA SANTANA PADILLA Y OTROS
Apelantes

v.

ESTADO LIBRE ASOCIADO DE PUERTO RICO, DEPARTAMENTO DE SALUD Y OTROS
Apelados

Núm. KLAN-00-00889

San Juan, Puerto Rico, a 30 de abril de 2001

Panel integrado por su Presidente, el Juez Miranda De Hostos,
y los Jueces Hernández Torres y Martínez Torres

Hernández Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparecen ante nos Ismael Santana y otros (en adelante los apelantes), y nos solicitan la revisión de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao, el día 25 de mayo de 2000, notificada y archivada en autos el 1 de junio de 2000. La parte apelante solicitó determinaciones de hechos adicionales el 9 de junio de 2000, la que fue resuelta por el tribunal de instancia el 15 de junio de 2000, notificada y archivada en autos el 6 de julio del mismo año. Mediante dicha sentencia, el tribunal de instancia declaró no ha lugar la demanda de daños y perjuicios presentada por los apelantes en contra de la Administración de Servicios Médicos de Puerto Rico (ASEM) (en adelante la apelada).

Luego de estudiado los hechos, el derecho aplicable, así como la transcripción de la prueba oral, revocamos la sentencia apelada.

### I

Los hechos que dan inicio a la presente controversia son los siguientes. El 27 de febrero de 1994, la Sra. Gertrudis Padilla Rodríguez (en adelante Doña Gertrudis), sufrió un accidente automovilístico en el cual sufrió múltiples traumas, por lo que fue trasladada al CDT de Río Grande.

Posteriormente, dado su condición de cuidado, Doña Gertrudis fue referida al Hospital Sub-Regional de Fajardo, en donde fue recibida alrededor de las 3:20 de la tarde. Allí fue evaluada por el Dr. Alejandro Marmolejo (en adelante Dr. Marmolejo). Este concluyó que la paciente presentaba un cuadro de múltiples traumas corporales, con síntomas de dolor en el pecho, dificultad de respirar y otros. Catalogó a la paciente como en categoría roja (atención médica urgente), pero estable. Por ello, el Dr. Marmolejo se comunicó personalmente con Sala de Emergencia del Centro Médico y solicitó el traslado de Doña Gertrudis, por estimar que los traumas que presentaba la paciente eran de gravedad y no contaba con las facilidades adecuadas para ser atendida allí.

Determinó además, que como su estado era crítico, pero estable, podía ser trasladada en ambulancia. Según la prueba desfilada ante el tribunal de instancia, el Dr. Marmolejo habló con la Dra. Palmira Martínez (en adelante Dra. Martínez), encargada para ese entonces de aceptar o negar el traslado de pacientes a dicha institución ("*screener*"), y ésta aceptó el traslado de Doña Gertrudis a las 3:30 de la tarde aproximadamente, en una ambulancia estatal.

A la fecha de los hechos la Dra. Martínez era empleada de ASEM, quien provee los médicos de la Sala de Emergencia del Centro Médico de Puerto Rico.

Como la ambulancia estatal solicitada para el traslado tardaba en llegar, los familiares de Doña Gertrudis solicitaron los servicios de la compañía de ambulancias privada, Cariño's Ambulance Service, a las 4:00 P.M para que realizara el traslado. La Dra. Martínez fue informada de la decisión de los familiares de trasladar a la paciente en la ambulancia privada, pero ésta se negó a recibir a la paciente en una ambulancia que no fuera la estatal. Adujo que no aceptaría el traslado en dicha ambulancia porque no tenía el equipo necesario para el traslado y no se podía hacer control médico desde la misma.

Según el testimonio del Sr. Jován Gandía Santos (en adelante Gandía), técnico de la ambulancia privada, la unidad que se utilizaría para el traslado era una clasificada como tipo 2, lo que significa que estaba completamente equipada para atender la condición de Doña Gertrudis y se podía hacer control médico mediante el uso del teléfono.

El Dr. Marmolejo, Gandía y la hija de Doña Gertrudis, Wanda Santana Padilla, hablaron en varias ocasiones con la Dra. Martínez para convencerla que aceptara el traslado en la ambulancia privada, pero ésta se negó. Como la facilidad receptora, en este caso Centro Médico, tenía que autorizar el traslado, no se pudo ofrecer el servicio de ambulancia privada a Doña Gertrudis.

La única ambulancia estatal que estaba disponible para trasladar a Doña Gertrudis, trasladó primero a otra persona, pariente de una enfermera del hospital Sub Regional de Fajardo, quien había estado involucrado en el mismo accidente automovilístico. Finalmente, a eso de las 10:25 de la noche, la ambulancia estatal recogió a Doña Gertrudis para trasladarla al Centro Médico, pero regresó a los tres minutos en clave blanca por haber sufrido un paro cardiorrespiratorio. A los pocos minutos murió.

Por los hechos relatados anteriormente, el 22 de agosto de 1994, los apelantes presentaron demanda por daños y perjuicios en contra del Departamento de Salud del Estado Libre Asociado de Puerto Rico, la Administración de Servicios Médicos de Puerto Rico (ASEM), Centro Médico de Puerto Rico, Hospital Sub-Regional de Fajardo, el Dr. Alejandro Marmolejo y la Dra. Martínez.

La demanda, en carácter personal a la Dra. Palmira Martínez, fue desestimada mediante sentencia el 7 de junio de 1999.

Los apelantes llegaron a un acuerdo transaccional con el Dr. Marmolejo, dictando el tribunal de instancia sentencia de conformidad el 27 de marzo de 2000.

La vista en su fondo fue celebrada con la participación de las partes co-demandantes Estado Libre Asociado y ASEM. Luego de desfilada la prueba, los apelantes llegaron a un acuerdo de transacción con el E.L.A., dictándose sentencia de conformidad el 27 de abril de 2000.

Sólo quedó entonces pendiente por resolver la acción en contra de ASEM, por lo que el tribunal de instancia solicitó a las partes que sometieran un memorando de derecho en el cual discutieran la alegada responsabilidad de ASEM frente a los apelantes.

Finalmente, el 25 de mayo de 2000, notificada y archivada en autos el 1 de junio del mismo año, el Tribunal

de Primera Instancia desestimó la demanda en cuanto a la ASEM, bajo el fundamento de que no existía relación causal entre su actuación y los daños sufridos por los apelantes.

Los apelantes presentaron una solicitud de determinaciones de hechos adicionales el 9 de junio de 2000, la cual fue resuelta por el tribunal de instancia el 15 de junio de 2000, notificada y archivada en autos el 6 de julio del mismo año. Estos, inconformes con la determinación del tribunal de instancia, acuden ante nos el 7 de agosto de 2000, y nos señalan la comisión de los siguientes errores:

*"Erró el tribunal apelado en su apreciación de la prueba al no concluir que el traslado de Doña Gertrudis en la ambulancia privada disponible, era uno apropiado, teniendo en cuenta que la único testigo presentada por ASEM no recordaba en absoluto los hechos de ese día, por lo que ASEM no contradijo, ni impugnó el testimonio del perito de la parte demandante, el Dr. Benito Colón, ni el testimonio del técnico de emergencias médicas Jován Gandía Santos quien habló con la Dra. Martínez en más de dos (2) ocasiones indicándole que su ambulancia tenía el equipo exigido por ella, ni el testimonio de la demandante Wanda Santana quien habló con la Dra. Martínez en dos (2) ocasiones, ni el del Dr. Marmolejo, quien tuvo oportunidad de examinar la ambulancia disponible y determinar que la misma llenaba los requisitos exigidos y así se lo comunicó a la Dra. Martínez.*

*Erró el tribunal apelado en su apreciación de la prueba y la aplicación del derecho al no concluir que ASEM incurrió en negligencia, simplemente porque no intervino con la paciente y los que le brindaron tratamiento inadecuado fueron los otros codemandados, cuando precisamente la paciente muere por la falta del tratamiento que se le pudo haber brindado y no se brindó en el Centro Médico debido a su actuación terca e inválida al no aceptar su traslado en una ambulancia que llenaba los requisitos exigidos.*

*Erró el tribunal apelado al no aplicar el estatuto federal correctamente, el cual determina que, en casos como el presente, aplica la doctrina de responsabilidad absoluta o 'strict liability', una vez que la parte demandante establece el hecho de la negativa de una sala de emergencia de recibir a un paciente."*

Esbozados los hechos más relevantes del presente caso, procedemos a discutir el derecho aplicable.

## II

Por estar estrechamente relacionados, atenderemos en conjunto los tres errores arriba señalados. La regla general en el campo de la responsabilidad civil extracontractual, es que aquél que por acción u omisión causa daño a otro interviniendo culpa o negligencia, estará obligado a reparar el daño así causado. Art. 1802 del Código Civil de P.R., 31 L.P.R.A. sec. 5141; *Bonilla v. Chardón,* 118 D.P.R. 599, 610 (1987). La culpa o negligencia es la falta del debido cuidado, que consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Toro Aponte v. E.L.A.,* Res. 31 de enero de 1997, **97 J.T.S. 18**, página 627.

Nuestro Código Civil dispone en su artículo 1802, *supra,* que se puede imponer responsabilidad por daños y perjuicios si se demuestra la concurrencia de los tres elementos que definen esta acción: 1) que ha habido una acción u omisión de una parte; 2) que ha mediado negligencia; y 3) que existe un nexo causal entre la acción u omisión de la parte y el daño sufrido.

En nuestra jurisdicción es norma reiterada que la apreciación de la prueba hecha por el foro primario merece gran deferencia por parte de un tribunal apelativo. En ausencia de error manifiesto, pasión, prejuicio o parcialidad, los tribunales apelativos no intervendrán con la apreciación de la prueba hecha por el Tribunal de Primera Instancia. *Pueblo v. Rodríguez Santana,* Res. 23 de octubre de 1998, **98 J.T.S. 141**, página 234; *Quiñones López v. Manzano Pozas,* Res. 25 de junio de 1996, **96 J.T.S. 95**, página 1305; *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49, 62-63 (1991). Dicha norma tiene como base la Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2, la cual específicamente dispone que las determinaciones de hechos realizadas por el Tribunal de Primera Instancia no deberán ser alteradas, a menos que se demuestre que las mismas son claramente erróneas o

producto de pasión, prejuicio o parcialidad. *Maryland Casualty Co. v. Quick Cont. Co.*, 90 D.P.R. 329, 335-339 (1964).

De igual forma, es doctrina firmemente establecida en nuestro ordenamiento que los juzgadores de hechos merecen gran respeto y confiabilidad en la apreciación imparcial de la prueba, pues éstos gozan de la oportunidad de ver y escuchar directamente a los testigos. *Flores Santiago v. Domínguez et al,* Res. 30 de junio de 1998, **98 J.T.S. 96**, página 1354; *Pueblo v. Maisonave Rodríguez, supra.* Sin embargo, lo anterior no significa que los tribunales de justicia poseen discreción absoluta y que las determinaciones de hechos del juez sentenciador tienen credenciales de inmunidad ante la función de un foro apelativo. *Méndez v. Morales*, Res. 15 de noviembre de 1996, **96 J.T.S. 149**, página 347; *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Pueblo v. Sánchez*, 90 D.P.R. 197, 200 (1964). (Enfasis Nuestro).

Por lo tanto, la decisión de un foro primario sólo será revocada cuando al revisar el expediente en su totalidad nos convencemos de que ha cometido un error significativo, o claro error de juicio en cuanto a un asunto material y relevante.

En *Soto Cabral v. E.L.A.*, 138 D.P.R. 298 (1995), nuestro Tribunal Supremo puntualizó que en Puerto Rico la responsabilidad civil por actos de mala práctica de la medicina debido a la impericia o negligencia de un médico, surge del Artículo 1802 de nuestro Código Civil, *supra,*. Además señala que una entidad dedicada al servicio de la salud, responde por la negligencia o impericia de sus empleados bajo el Artículo 1803 del Código Civil, de forma tal que la prestación de los servicios médicos sin la debida diligencia puede generar responsabilidad civil del médico u hospital, en el supuesto de que la falta de diligencia cause daño. El Tribunal Supremo señaló que la norma que aplica a estos casos es que, para que nazca la responsabilidad civil médica, el promovente de la acción tiene que establecer la ocurrencia de un acto médico culposo o negligente, la producción de un daño real, y la relación causal entre el acto médico y el daño sufrido.

En *Blas Toledo v. Hospital Nuestra Señora de la Guadalupe*, Opinión de 30 de junio de 1998, **98 J.T.S. 101**, página 1452, el Tribunal Supremo reiteró que en casos de alegada impericia médica, la parte demandante viene en la obligación de establecer mediante preponderancia de la prueba que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. La relación entre el daño y la negligencia causada, no se establece a base de una mera especulación o conjetura. (Enfasis Nuestro) Véase, además, *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719, 744 (1983); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 650 (1988) En relación al grado de diligencia exigido en este tipo de casos, existe una presunción de que el médico administró el tratamiento adecuado a su paciente, lo que implica que le corresponde al demandante presentar prueba suficiente para controvertir que el tratamiento fue adecuado. *Sáez v. Municipio de Ponce*, 84 D.P.R. 535, 543 (1962); *Ramos Orengo v. Capital,* 88 D.P.R. 315, 328 (1963). El simple hecho de que el paciente haya sufrido un daño, o que el tratamiento no haya tenido éxito, no establece la negligencia del médico. Definitivamente, al igual que en toda acción sobre daños y perjuicios, el demandante tiene que probar con preponderancia de la prueba que el daño ocurrido se debió con mayor probabilidad a la negligencia imputada por el demandante. Para establecer *prima facie* un caso de daños y perjuicios por negligencia de un médico o de un dentista, el demandante tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la relación causal entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. (Enfasis Nuestro), *Medina Santiago v. Vélez*, 120 D.P.R. 380, 384 (1988). Al demandante se le exige que establezca mediante prueba pericial cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de determinado tipo de paciente y la razón por la cual el médico demandado no cumplió con las mismas. *Medina Santiago v. Vélez, supra*, página 386.

Dado el hecho de que en casos de impericia médica, el peso de la prueba recae en la parte demandante, el Tribunal Supremo ha expresado su posición con relación a la importancia de la prueba pericial para demostrar la conducta negligente del médico demandado. (Enfasis Nuestro). En *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 821-822 (1987), el Tribunal Supremo indicó que:

*"Al cumplir con nuestra función revisora en casos de impericia médica, nuestra decisión debe estar fundada en la prueba vertida en el juicio por los peritos y la prueba documental. En ausencia de prueba, no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil, supra. Esta norma fue posteriormente reiterada en Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 649 (1988)."*

Es un principio básico de la suficiencia de la evidencia, que *"la declaración de un testigo no contradicho, sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por sus contradicciones o su conducta en la silla testifical, se haga indigno de crédito." Villaronga v. Tribunal,* 74 D.P.R. 331, 345 (1953).

### III

En adelante transcribimos parte de la prueba desfilada ante el Tribunal de Primera Instancia, relevante a la controversia planteada ante nos:

*"TESTIGO: DR. ALEJANDRO MARMOLEJO*

*EXAMEN DIRECTO POR EL LCDO. RIVERA MOREAU (representante legal de los apelantes).* ■

*P. En relación con la paciente Doña Gertrudis y su quehacer dentro del marco legal, ¿qué era lo importante en la transferencia, aparte de la estabilización.*

*R. Que sea aceptada en el centro donde se quiere hacer el "transfer".*

*P. Que fuera aceptada. ¿Que fuera aceptada por quién?*

*R. Por el médico del otro centro donde se quiera hacer el "transfer".*

*P. Que en este caso ¿era quién?*

*R. En este caso, yo me comuniqué por teléfono con una doctora de apellido Martínez.*

*P. ¿Doña... La doctora Palmira Martínez?*

*R. Sí, creo que es la doctora Palmira Martínez.*

*P. Muy bien. ¿Y ella qué hizo en relación con esa aceptación?*

*R. Me aceptó el caso a las ...*

*Juez: Hablé claro, que no le entiendo bien.*

*R. Perdón. Al paciente le presente ¿Le puedo dar...*

*Juez: ¿Ella le aceptó el caso dice?*

*R. Sí Señor.*

*Juez: ¿Cuándo?*

*R. Inmediatamente la llamé, inmediatamente que llegó la paciente.*

*P. Sí. ¿Era posible enviar esta paciente sin esa autorización de la doctora Martínez?*

R. No, no, la Ley lo impide ....

... .

P. ¿Qué pasa, entonces, ante esta negativa de que no podemos atender a más de una emergencia en ese sector porque la otra es pal' pueblo? ¿Qué pasa? ■

R. Bueno, surge la... la alternativa de una ambulancia privada que creó que uno de los familiares me preguntó ... me preguntó a mi o a una de las muchachas si había una. Y yo dije: "Bueno, existe la ... Cariño Ambulance.

P. Ambulancias Cariño. ¿Para ese entonces usted sabe, si sabe, que estas ambulancias necesitaban algún tipo de licencia?

R. Se supone que tengan licencia.

P. ¿y que estén aprobadas por quién?

R. Ese dato sí yo no lo puedo decir.

P. Pero, no era cualquier ambulancia que viniera y se lo llevaba, o sea, había que pedir autorización también.

R. Claro que sí.

R. ¿Había anteriormente transferido Ambulancias Cariño pacientes de sala de emergencia?

R. De sala de emergencia, claro que sí.

P. ¿Qué pasó, entonces?

R. Me comuniqué con... Centro Médico de nuevo.

P. Anjá.

R. Para presentar el caso.

P. Unjú.

R. Que no tenía ambulancia disponible y que tenía la alternativa de Cariño Ambulance.

P. ¿Con quién habló?

R. Con la doctora Martínez.

P. ¿Doctora Palmira Martínez?

R. Doctora Palmira Martínez.

P. ¿Ella era que, médico en la sala de emergencia de ...

R. Ella era el "screener" de la sala de emergencia.

P. Okey. Siga.

R. Le presenté el caso, porque yo estoy cambiando de ... de ...

P. ¿De vehículo?

R. De vehículo, debo notificarlo. E inclusive, en Centro Médico iban a recibir llamada de Cariño Ambulance para notificar este "transfer".

P. Claro, claro.

R. Entonces, tengo que comunicarle: "Mira, Palmira, te voy a enviar el paciente en una ambulancia privada porque la ... tengo una ambulancia aquí que no me la quieren prestar.

P. ¿Qué dijo ella o que pasó?

R. Entiendo que no me aceptó el "transfer"

Juez: La pregunta fue qué le dijo ella.

R. Que no me aceptaba el paciente en esa ... en esa unidad.

P. ¿En qué, en Ambulancias Cariño?

R. En Cariño Ambulance.

P. ¿Por qué?

R. Ese por qué no lo recuerdo, no le puedo decir el por qué. Pero si ella no lo acepta, pues yo digo..debo ... ella es la que está encar ... a cargo de la .... del "transfer" de ese paciente y yo no puedo mandar un paciente que ella no me lo acepte.

P. Entonces, se convierte como buen médico en abogado de ese paciente para lograr el "transfer". ¿Es correcto eso?

R. Yo estoy intentando transferirlo, porque el paciente, pues este paciente necesitaba del servicio unos estudios que yo no le...

P. Le pregunto...

R. ... pero ameritaba unos ... unos ... otros cuidados multifactoriales.

P. De inmediato.

R. De inmediato, desde el punto de vista neurológico, de ... cardiovascular.... No tengo.. no tengo un diagnóstico..

P. Sí, ¿bajo M.B.T.?

R. Bajo M.B.T.

P. ¿Qué pasó, entonces?

R. Seguí haciendo una serie de gestiones llamando a los muchachos explicándole la situación para ver si podía conseguir la ambulancia que era, la ambulancia ... Pero eso fue infructuoso. Entonces, me info... la ... uno de los

*familiares me pidió hablar con... con la Dra. Martínez, porque ...*

*P. El teléfono que utilizaron, ¿fue el celular de una ... de un familiar, verdad que sí?*

*R. Sí, recuerdo que fue un celular, porque en esa época había que comunicarse al cuadro, del cuadro ... Y me dijo: "Doctor, mire yo creo que con mi teléfono podemos marcar más rápido". Y yo entendí: "Bueno, está bien, no hay problema, a ver si...", pero desde el punto de vista eso yo no lo debo hacer.*

*P. Sí, pero lo hizo.*

*R. Yo no debo violar... eh... ahí, porque usé. Yo no puedo poner a un familiar de un paciente a hablar con un médico.*

*P. Pero usted entendía que era meritorio ...*

*R. Pero...*

*P. ...por la urgencia.*

*R. Y yo quería, pues que la familia vea que no es que yo no quiero, es que quiero transferir el paciente y... caramba, a ver si.,.. para que vea que yo hice mis gestiones y yo no podía, pues, poner ahí hablando con la doctora. Okey, pero lo hice.*

*P. ¿Y que pasó?*

*R. Ellos hablaron; no sé que pasó. Después ella me dio el teléfono y la doctora Martínez me dijo su ... su objeción, que no lo aceptaba. Y yo no podía ya hacer más nada.*

*P. Sí, ¿pero porqué le dijo ... la doctora Martínez le dijo porqué?*

*R. Ella entendía...ella entendía que las ambulancias ... esta ambulancia no tenía los permisos que ameritaba el "transfer".*

*P. Anjá.*

*R. No tenía el "expertise".*

*P. Anjá. ¿Y que ella requería para ese "expertise", un "medical control" .*

*R. Puede ser un "medical control".*

*P. No, no, no puede ser; en este caso.*

*R. Un "medical control".*

*P. ¿Y un "medical control" es qué?*

*R. Un médico.*

*P. ¿Un médico que se monte en la ambulancia, correcto?*

*R. Sí.*

P. O una transmisión de ambulancia al Centro Médico donde se va monitoreando, por falta de una palabra mejor, lo que está pasando en esa ambulancia hasta que llega, ¿correcto?

Q. Hasta que llega; eso es correcto.... ......

P. ¿Entonces, qué pasó o qué alternativas le dio la doctora Martínez? ■

R. Que solamente la aceptaba en la sala ... en emergencias médicas estatal, en la ambulancia de emergencias médicas estatal.

P. ¿Ninguna otra alternativa?

R. Ninguna otra alternativa yo tenía.

P. ¿Qué pasa luego?

R. Luego ... eh... llega la ambulancia.

P. ¿A que hora?

R. Ese dato no lo tengo ....

P. Sí, búsquelo en el expediente por favor, en el expediente médico. Aquí está en el "C.P.R Chart".

R. Okey. A las 10:22.

......

P. Doctor Marmolejo, hacerle creo que dos ... son dos o tres preguntitas más.. Yendo a su conversación con la gente de Cariño, ¿usted recuerda en específico que habló con un paramédico que decía conocerlo porque había trabajado con usted en otros hospitales? ■

R. Recuerdo, era como de los ojos claros; el nombre no me recuerdo.

P. ¿Usted lo vio físicamente ese día?

R. Un paramédico de Cariño, sí señor?

P. O sea, ¿que ese día a Fajardo, el 23 de febrero del 94, fue un paramédico de Cariño Ambulance y habló con usted personalmente?

R. Sí, señor.

P. ¿Y qué... qué aconteció?

R. El me dijo: "Contra, Marmolejo, tu me conoces a mí, ¿qué pasa que no me la aceptó?" "Bueno, el problema es allá; conmigo no hay problema. Pero si allá no quieren aceptar esa ambulancía, yo tengo que hacer la... Pero si allá dicen que no, ....

P. ¿El estaba con...

R. ...yo estaría violando la Ley".

P. ....el estaba con el equipo?

R. Bueno ¿con la ambulancia?

P. Sí

R. Sí. Eso fue ese mismo día.

P. En su mente, de lo que aconteció ese día, ¿le queda a usted alguna duda de la razón por la cual no se pudo transferir porque era por las ambulancias de Cariño?

Juez: ¿Cómo es?

R. O sea, es una opinión .... Yo le dije ...

P. Okey, yo se la refraseo.

P. ¿Cuál, en su mente, fue la razón por la cual esta señora no pudo llegar al Centro Médico de San Juan?

Juez: O sea, que diga a base del récord médico, a base de lo que pasó, porqué el Centro Médico rehusó sus servicios.

R. Esa versión la declara aquí ....

Juez: Mire a ver ... Es que hay unas ...

P. Sí, pero es que él es el "treating". O sea, ...

Juez: Pero hay otras razones que fueron por ahí, pero ...

P. Vamos a ponerlo de esta manera, ¿cuál fue el escollo que usted se encuentra para transferir a esta paciente al Centro Médico de Río Piedras?

ARGUMENTACION ENTRE ABOGADOS EN CUANTO A LA ADMISIBILIDAD DE LA PREGUNTA.

P. ¿Fue la negativa de la doctora Palmira Martínez en admitir a esta paciente a su cuidado de las Ambulancias Cariño lo que evitó que ella llegara allí?

Lcdo. Marchese: Su Señoría, tenemos objeción, porque sabemos que se hicieron gestiones a diferentes ambulancias y no pudieron acudir por diferentes razones que explicó el doctor. Es que está haciendo una pregunta sugestiva para mantener una pregunta fuera de contexto.

Juez: Que conteste.

P. Por favor, ¿se la repito?

R. Por favor.

P. ¿Fue la negativa de la doctora Palmira Martínez en cuanto a aceptar a doña Gertrudis en la ambulancia de Cariño el que evitó que ella llegara al Centro Médico de Río Piedras, sí o no?

R. Sí.

*TESTIMONIO DEL DR. BENITO COLÓN SOTO, PERITO DE LA PARTE DEMANDANTE-APELANTE.*

*EXAMEN DIRECTO POR EL LCDO. SANABRIA, REPRESENTANTE LEGAL DE LOS APELANTES.* ▪

*P. Doctor Colón, para beneficio del Tribunal, podemos entender que usted tiene licencia .... y por el Tribunal Examinador de Médicos de Puerto Rico.*

*R. Eso es correcto. Soy el cuatro cinco cuatro siete (4547).*

*P. ¿También entendemos que usted tiene una Especialidad en Medicina de Emergencia?*

*R. Correcto.*

*P. Esa licencia, perdón, esa Especialidad está certificada en estos momentos.*

*R. Sí, señor. El Tribunal Examinador de Médicos de Puerto Rico cuando un médico ya es médico licenciado, extiende la licencia con el mismo número de licencia, pero especificando la especialidad de uno en eso.*

*P. ¿Y esa certificación también está al día?*

*R. Correcto.*

...

*P. ¿Y en tal carácter, qué responsabilidades relevantes a ese caso tiene usted?*

*R. Bueno, en ese momento fue el crear el sistema de emergencias de Puerto Rico porque en Puerto Rico no había sistema de Emergencias Médicas. Hubo que enmendar reglamentar...*

...

*P. Doctor, para beneficio del Tribunal y para ahorrarle tiempo esta tarde, vamos a tratar de concentrarnos en la investigación que hizo usted relativo a este caso. Específicamente en cuanto al incumplimiento o falta del mismo en las normas de traslado, protocolo y la aceptación de pacientes referidos, etcétera. Para fines de récord, quiero dejar claro que usted ha estado en Sala mientras han prestado testimonio los demás testigos en este caso. Entiendo, corríjame si estoy equivocado, que usted escuchó el testimonio de todos ellos.*

*R. Sí, eso es correcto.*

*P. Por favor, trate de cubrir cuáles son los deberes y responsabilidades de un médico de Sala de Emergencias en función de la transferencia de un paciente hacia otra facilidad sanitaria.*

*R. Sí, cuando un paciente llega a Sala de Emergencias...*

...

*R. Cuando un paciente llega a Sala de Emergencia, ya sea de... requiere generar un referido, el médico le hace unas, unas, un sorteo de paciente, eso es una palabra que se usa en el... Ahí se determina cuál es la emergencia, y dentro de la emergencia que haya en esa Sala, cuál tiene prioridad en ese caso. Una vez se establezca esa prioridad, el paciente si se categoriza en rojo, debe ser inmediatamente manejado todo el tiempo por el médico* y hacer las gestiones para el traslado al sitio más adecuado para ser visto por la persona más adecuada.

*En este caso que nos trae, el paciente se le tomaron unas radiografías y a las tres y algo se inició unas gestiones de traslado y fue aceptado por el médico "screener" de Centro Médico.*

*P. Ese médico "screener" de acuerdo a la investigación que usted ha hecho, es la persona que se ha mencionado aquí como la Dra. Palmira Martínez.*

*R. Eso es correcto, señor.*

*P. Por favor, continúe.*

*R. Muy bien. El médico Generador, vamos a llamarlo, Su Señoría el Generador y Receptor, el Médico Generador es el que inicia las gestiones de traslado hacia las facilidades, cómo se llama, receptoras, que va a, de acuerdo a la información del Médico Generador, va a determinar si las necesidades del paciente se pueden considerar en esa área y va a empezar a hacer los arreglos, ya sea de Cirujano de Tórax, ya sea General Neurocirujano de cualquier equipo que sea necesario de pacientes de ...*

*P. ¿Ese es el receptor?*

*R. El Receptor. Eso se establece una palabrita que es media ... E.T.A. que es "Estimated Time of Arrival". El médico que acepta el paciente, al aceptarlo, ya comparte responsabilidad con el Generador y tiene que establecer el E.T.A. de ese paciente para tener el equipo disponible y que ese paciente no pierda tiempo en una reevaluación innecesaria.*

*La responsabilidad es compartida y mis médicos en esa Sala de Emergencia, los "screeners", tienen la obligación igual que tiene el médico generador como tiene la responsabilidad de monitorizar el E.T.A. de ese paciente para tener los demás especialistas para recibir el paciente. O sea, que es una responsabilidad compartida en todo momento y no puede divorciarse una de la otra.*

*...*

*P. Doctor, usted ha explicado que surgen, podría decir que surgen... equipo de trabajo entre el Generador y el Receptor.*

*R. Es una responsabilidad compartida y un equipo de trabajo.*

*P. De manera que para que eso surja, el Médico Receptor tiene que, para utilizar la misma palabra... aceptar el paciente.*

*R. Sí. Ese médico, en este caso el Centro Médico, tiene que aceptar todos los pacientes porque es la facilidad Supra Terciaria de la Isla. O sea, ningún sitio en Puerto Rico va usted a encontrar los oftalmólogos, neurocirujanos, cirujanos de tórax, disponibles veinticuatro horas al día.*

*P. De manera que en este caso, de acuerdo con el conocimiento suyo de los protocolos de transferencia de pacientes, usted entiende que la doctora Martínez podía rehusar a la paciente Doña Gertrudis Padilla después que la aceptó.*

*R. Perdone. No le oigo bien.*

*P. ¿Podía rechazarla luego de aceptarla?*

*R. No licenciado. Una vez los parámetros que se le dieron a ella inicialmente eran de que eso es suficiente para aceptarlo, lo que hay es que coordinar la llegada del paciente y punto. No hay otra alternativa.*

P. Bien. Usted escuchó el testimonio del Dr. Marmolejo.

R. Correcto..

P. El doctor Marmolejo en una parte de su declaración le explicó al Tribunal unas leyes de eventos y contratiempos que él alega sostuvo para transferir a la paciente, Gertrudis Padilla, en una ambulancia privada. Alegó él, expresó él que la doctora Martínez, como Médico Receptor, puso objeciones a la transferencia mediante esa ambulancia privada. ¿Qué opinión le merece a usted la conducta de ambos médicos en esa específica función?

R. Yo entiendo que, inicialmente, el Doctor Marmolejo fue diligente. Y yo entiendo y es así que la Doctora Receptora no tenía autoridad o por lo menos tenía que ofrecer alternativas. Es de todos conocimiento que aquí Bases Navales prestan los helicópteros, que hay otras ambulancias.

Yo personalmente, Su Señoría, cuando me nombraron Secretario de Emergencias Médicas evalué todos los servicios de ambulancias de Puerto Rico, y recuerdo especialmente las de Cariño. Una ambulancia Tipo 2 con todos los requisitos y se le autorizó una carta que yo personalmente escribí a usar la frecuencia del Net de nosotros en caso de emergencia o, en su defecto, hacer "phonepatch".

"Phonepatch", si quiere el Tribunal, le explico. Las ambulancias tienen todas radio, pero al no tener la frecuencia lo que hace es que el despacho central de esa ambulancia se comunica con el despacho central de Emergencias Médicas. Deja la línea abierta y transmite del radio al teléfono y ellos reciben viceversa. Por eso se llama "phonepatch" y eso es una cosa... esto... es...

P. Bien. Doctor, usted mencionó que la doctora Martínez debió ofrecer alternativas.

R. Correcto.

P. ¿A qué alternativas se refiere usted?

R. Yo me refiero, primero, a que el médico al compañero aquí ... mira, tú no tienes control médico, tienes ... y eso, eso elimina la falta de Medical Control más autorizarle que hiciera "phonepatch" con el despacho central. Segundo, si no había ambulancias, alternativas aéreas. El Departamento de Salud tiene una gente que se llaman Coordinadores Interestatal que él se encarga de coordinar traslados con la Policía de Puerto Rico o el Coast Guard y cualquier otra, la Energía Eléctrica y cualquier otra agencia que tenga unidades aéreas.

P. Doctor Colón, se supone, se espera que un médico "screener" en Sala de Emergencia del Centro Médico de Río Piedras conozca de estas alternativas.

R. Es mandatorio que las conozca si es el ... único de Puerto Rico.

...

P. Bien. De la investigación que usted ha realizado, ¿de qué manera entiende usted entonces, si de alguna, falló el Centro Médico de Río Piedras?

R. El Centro Médico de Río Piedras una vez acepta el paciente y pone causas que no tienen validez porque, primero, es que la doctora o el, la gente de Centro Médico no estaba viendo la ambulancia, quien la ve es el médico de acá. Y, además, con sólo preguntar si tenía la Certificación de Salud, porque yo creé una División de Inspección de Ambulancias y se le exigía a toda esta gente a todas ... compañías que tuvieran el equipo idéntico que tenía el Estado, las Ambulancias del Estado y cualquier ambulancia que tuviera un permiso para trabajar para usar ambulancia Tipo 2 tenían el equivalente en equipo y personal. O sea, que eso no era la

436

*excusa razonable para imponer un tipo de ambulancia o para negar un traslado sin conocer la ambulancia que está reconocida. Segundo, no ofrecer alternativas. El paciente aquí es lo importante. La vida de un paciente dependía de la alternativa que brindara el Receptor y fueron las que mencioné ahorita, el "phonepatch", la línea del paciente al médico, el paciente al médico, no, el médico al paciente, transportación aérea. O sea, hubieron [sic] tantas alternativas y existen tantas alternativas. Yo se que Su Señoría le preocupó mucho eso, pero hay alternativas. Cualquier cosa que nos pase en un accidente tenemos un sinnúmero de alternativas, y está en la capacidad del Receptor disponerlas.*

*...*

*P. El compañero Rivera le hizo una pregunta al doctor Marmolejo en relación a si cuando se determina que hay una urgencia médica debe dársele traslado en el mejor equipo disponible en el momento. ¿Usted entiende que la Ambulancia de Cariño era el mejor equipo disponible?*

*R. Yo entiendo que es, no solamente eso, sino que estaba a nivel de cualquiera de las del Estado. Tenía la licencia de Emergencias Médicas. Estaba inspeccionada y aprobada por nosotros.*

*P. De manera que es su opinión profesional de que la doctora Martínez no debió condicionar el traslado porque fuera en una ambulancia de ellos.*

*R. Ella debió ofrecer las alternativas más lógica es decirle "doctor, si usted no tiene Medical Control .... véngase usted con ella." Si usted viene no hay que hacer Medical Control y está viendo a la ambulancia en ese momento ... ella, incluso, ... Está reconocida o está aceptada o aprobada por Emergencias Médicas. Pero la alternativa era mandatoria. Fue una negativa y el no aceptar al paciente.*

*TESTIMONIO DE LA DRA. PALMIRA MARTÍNEZ, ÚNICO TESTIGO PRESENTADO POR LA PARTE DEMANDADA-APELADA ASEM.*

*EXAMEN DIRECTO POR EL LCDO. ELLYS RIVERA MALAVE:* ▮

*Juez: Para el veintisiete de febrero del noventa y cuatro, ¿usted trabajaba en...? Esa es la pregunta, en Centro Médico en la Sala de Emergencias.*

*R. En el noventa y cuatro yo trabajaba en Sala de Emergencia del Centro Médico, exactamente sí, el veintisiete de febrero, verdad, sí, en febrero yo trabajaba allí también ... ese día ...*

*Juez: Usted sabe que hoy ha venido a declarar en el caso específico. Le pregunto si usted tuvo la oportunidad de ... revisar algún tipo de notas o expedientes que le permita a usted hoy declarar en el Tribunal.... de este caso.*

*R. Lo que sucede es que yo no tengo ninguna nota mía con respecto a esto. Porque eso no se lleva a cabo...*

*Juez: Esta bien, pero el día veintisiete de febrero, no hay duda de que ese día usted estaba en Centro Médico.*

*R. Sí, estaba en Centro Médico.*

*Lcdo: Juez, nosotros enmendamos también la demanda.*

*Juez: Está bien, pero estamos aquí en récord.*

*Lcdo: Sí, no, por eso, vuestro honor.*

*Juez:* ¿Y ese día usted tuvo la oportunidad en horas de la tarde, de tener alguna comunicación con el Hospital Regional de Fajardo, si tiene memoria?...algunos pacientes que se estaba pidiendo que se transfirieran ...

*R. Específicamente, eso no lo ...*

*Juez:* ¿No?

*R. O sea, eso no lo recuerdo.*

*Juez:* Si se le dice, por ejemplo, que el doctor Marmolejo, usted recuerda que no ...

*R. Sí, vuestro honor.*

*Juez:* Si para ese año, le ha hecho una llamada con respecto a una paciente que se llamaba ....

*Lcdo. Rivera:* Gertrudis Padilla Rodríguez.

*R. Específicamente, el caso no lo recuerdo.*

*Juez:* ¿Si usted recuerda haber recibido alguna ... alguna llamada de un familiar de doña Gertrudis en ese día, telefónica?

*R. Eso tampoco lo recuerdo.*

*Juez:* ¿No?

*R. No"*

## IV

De la prueba desfilada ante el tribunal de instancia, surge que Doña Gertrudis falleció debido a una cadena de circunstancias de las cuales fueron responsables múltiples personas y factores. Concluyó el foro de instancia que ASEM, quien responde por las actuaciones de la Dra. Martínez, no es uno de ellos. No estamos de acuerdo.

Surge con meridiana claridad de la prueba desfilada ante el tribunal de instancia antes transcrita, que uno de los factores por los cuales a Doña Gertrudis no se le pudo salvar la vida, fue por no haber sido trasladada de inmediato al Centro Médico, única institución que le podía brindar el tratamiento necesario para la condición que presentaba. Fue la actitud obstinada de la Dra. Martínez la que no permitió que el traslado se efectuara en la única ambulancia disponible, ocurriendo el trágico desenlace que relatamos anteriormente.

Nos llama poderosamente la atención, el hecho de que la Dra. Martínez, empleada de ASEM, en su testimonio se limitara a decir que no recordaba los hechos de este caso. Los jueces no podemos creer lo que nadie creería. El negarse la Dra. Martínez a arrojar luz con su testimonio sobre los sucesos de ese día, es una continuidad de su negligencia inexcusable y de su actitud insensible.

Los apelantes presentaron ante el tribunal de instancia prueba suficiente que demostró la ocurrencia de los elementos básicos del Art. 1802, *supra*, a saber: que hubo una acción u omisión; que medió negligencia y el nexo causal entre la acción u omisión y el daño sufrido.

Según el testimonio del perito de la parte apelante, el cual debió recibir entero crédito por parte del tribunal de instancia, ya que no fue contradicho por la parte apelada, la institución receptora, en este caso Centro Médico, era responsable, una vez aceptó el traslado, de lograr que la paciente llegara a la institución lo más pronto posible. Eso no ocurrió. La Dra. Martínez, no solamente se negó a recibir la paciente en una

ambulancia, que según la prueba desfilada reunía los requisitos para hacerlo, sino que dejó de ofrecer alternativas que viabilizaran el traslado. Siendo ello así, procedía que el tribunal de instancia declarara con lugar la demanda en contra de ASEM.

## V

Por los fundamentos anteriormente señalados, REVOCAMOS la sentencia emitida por el Tribunal de Instancia y devolvemos el caso a dicho foro para la celebración de la vista de daños.

El Juez Rafael Martínez Torres concurre con el resultado.

Lo acordó y manda el Tribunal y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

### ESCOLIOS 2001 DTA 158

**1.** Páginas 97-98 de la transcripción de la prueba desfilada ante el Tribunal de Primera Instancia.

**2.** Continuación del examen directo del Dr. Marmolejo, págs. 179-184 de la Transcripción de la prueba oral.

**3.** Página 190 de la transcripción de la prueba oral.

**4.** Páginas 194-198 de la transcripción de la prueba oral.

**5.** Páginas 270-286 de la transcripción de la prueba oral.

**6.** Páginas 335-337 de la transcripción de la prueba oral.