# 2002 DTA 120

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL V DE PONCE Y AIBONITO

JESUS MANUEL BERNIER BARRIERA;
BETHZAIDA BARRIERA ESTRADA Y OTROS
Apelados

v.

RAFAEL A. CRESPO CRUZ h/n/c FAMILY HEARING CENTER Y OTROS
Apelantes

Núm. KLAN-01-00700

San Juan, Puerto Rico, a 12 de julio de 2002

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Aponte Jiménez y la Jueza Pabón Charneco

Brau Ramírez, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA1SENTENCIA**

**I**

Los apelantes, Rafael Crespo Cruz, su esposa Mayra J. Burgos Rodríguez y la sociedad legal de bienes gananciales compuesta por ambos, solicitan la revisión de una sentencia emitida el 7 de junio de 2001 por el Tribunal de Primera Instancia, Sala Superior de Ponce, que declaró con lugar la demanda por daños y perjuicios por mala práctica de la audiología instada contra los apelantes por la parte apelada, Bethzaida Barriera Estrada, actuando por sí y en representación de sus hijos Jesús Manuel y Agnes Enid Bernier Barriera.

La demanda está relacionada a los servicios profesionales de audiología prestados por el apelante al menor apelado Jesús Bernier Barriera.

El Tribunal condenó a los apelantes a pagar $12,000.00 por concepto de daños ocasionados a la parte apelada.

Revocamos.

## II

Según surge del recurso, el apelante es un audiólogo licenciado, con oficinas en los pueblos de Ponce y Yauco, las cuales opera bajo el nombre comercial de *"Family Hearing Center"*. Como parte de sus servicios profesionales, el apelante ofrecía servicios a estudiantes de escuelas públicas con aparentes problemas auditivos, que le eran referidos por el Departamento de Educación, bajo el Programa existente del Título I de la Elementary and Secondary Education Act., 20 U.S.C. sec. 6301 *et. seq.*; 34 C.F.R. sec. 200.

A la fecha de los hechos, el menor apelado Jesús Bernier Barriera era estudiante en la Escuela Jaime L. Drew, de Ponce. En o cerca de abril de 1996, la enfermera escolar de dicho plantel lo refirió a donde el apelante para ser evaluado, como parte del referido Programa de Título I.

El 16 de abril de 1996, el menor apelado acudió junto a su madre a la oficina del apelante, según referido. En dicha visita, el apelado le realizó al menor una prueba audiológica, luego de la cual, diagnosticó que el menor padecía de *"pérdida auditiva de tipo sensoneural que va de leve a moderada en ambos oídos"*. El apelante realizó entonces una examen al menor de Auditory Brainstem Response (*"A.B.R."*), la cual es una prueba de tipo objetivo, con el propósito de confirmar su impresión diagnóstica. El A.B.R. reflejó que el niño efectivamente tenía una pérdida leve de audición.

El apelante le recomendó al menor el uso de amplificadores con el propósito de corregir la pérdida auditiva que le había identificado. El apelante se ofreció a suplir el equipo, que era vendido por él. ■

El equipo fue eventualmente sufragado por el Departamento de la Familia. El costo total fue de $1,510.00.

Al utilizar los audífonos, el menor empezó a experimentar una serie de dificultades. Mostraba poca tolerancia y adaptación a los mismos. Decía escuchar en un volumen alto o sentir ruidos y ecos en momentos de silencio. Sentía mucha sensibilidad, molestia e irritabilidad.

Debido a estos problemas, el menor optaba por mantener desconectados los audífonos durante sus clases. Esta situación era conocida por sus maestras, quienes le requerían al niño que usara los audífonos, según se le había recetado. El menor se rehusaba, se quitaba los audífonos y los guardaba en su bulto, ya que oía ruidos cuando los tenía puestos.

Los otros estudiantes se burlaban de él y lo rechazaban. Mientras, en su casa también confrontaba problemas con su hermana menor a la que increpaba continuamente por el alto volumen de los equipos de sonido.

El menor fue referido a otro audiólogo, José Mercado Zayas, sin que éste lograra detectar cuál era el desperfecto en los audífonos. Dicho profesional encontró que la audición del menor era normal.

Ante esta situación, la madre del menor solicitó a la escuela que le expidiera un nuevo referido a un tercer audiólogo, para confirmar si la audición del menor era normal.

En esta ocasión, el menor fue atendido por la audióloga Lizbeth Rodríguez Albertorio. Esta determinó que la audición del menor estaba bien y que lo que sucedía era que el menor no necesitaba el equipo de audífonos, el cual le había sido indebidamente recetado y vendido. Concluyó que el diagnóstico realizado por el apelante

había sido erróneo.

Los apelados instaron entonces la presente demanda por daños y perjuicios contra el apelante, su esposa, y la sociedad de bienes gananciales compuesta por ambos, solicitando compensación por sus daños. Alegaron que el apelante había incurrido en mala práctica profesional al recetar audífonos al menor, lo que había ocasionado graves daños e inconvenientes a éste, así como a su madre y hermana.

Los apelantes contestaron la demanda, negando las alegaciones. Presentaron, además, una reconvención, solicitando compensación por los daños y angustias sufridos por ellos como consecuencia de la demanda.

Luego de varios trámites, el Tribunal celebró la vista del caso. Las partes presentaron evidencia testifical y pericial en apoyo a sus respectivas posiciones. La parte apelada presentó el testimonio del menor, quien declaró sobre los inconvenientes que le ocasionaban los audífonos. También testificó sobre este particular, Doris Rivera, maestra del menor.

Además, declararon los tres audiólogos que en distintas ocasiones habían evaluado al menor, incluyendo el apelante, así como la madre del niño.

La audióloga Lizbeth Rodríguez Albertorio declaró que examinó al menor apelado el 27 de febrero de 1998. Este le había sido referido por el programa escolar de Título I. Ese día le practicó una prueba audiológica básica, que es la prueba estándar en estos casos. Dicha prueba reveló que el menor tenía una audición normal.

La audióloga Rodríguez discutió sus hallazgos con la madre del menor, los que resultaron negativos. La madre del niño le informó entonces que el menor había sido evaluado previamente y que se le había diagnosticado pérdida auditiva, por lo que estaba utilizando audífonos, aun cuando no quería usarlos.

La testigo explicó que, conforme a su evaluación, la audición del menor era normal. Durante su testimonio, se le mostró el resultado de la prueba de audiometría realizada por el apelante. De su examen de los documentos, expresó que no veía base para concluir que el niño tuviera una pérdida auditiva de moderada a severa en ambos oídos. La testigo reconoció que la prueba de A.B.R. había reflejado que la onda quinta estaba presente hasta treinta (30) decibeles y opinó que ello era una audición normal, no una pérdida auditiva leve.

La testigo indicó que, ante el cuadro del niño, ella no hubiera recomendado el uso de amplificación. Aclaró que ella vende equipos de amplificación y que está familiarizada con su uso. Señaló que si un niño es expuesto al uso de amplificación de forma innecesaria, puede sufrir daños auditivos, al recibir una señal más fuerte de lo que se supone.

A preguntas del abogado del apelante, la testigo admitió que del historial del menor surgía que éste presentaba aparentes problemas de audición y que estaba teniendo problemas académicos. Señaló que ella no había visto los resultados de las pruebas realizadas por el apelante antes del juicio y que no lo había llamado para ver en qué había basado su diagnóstico. Ella no hizo una prueba de A.B.R.

La testigo indicó que el menor no reflejaba pérdida auditiva, a pesar del uso de los audífonos. Admitió que el apelante había seguido el protocolo de amplificación de niños aceptado por la Asociación Audiológica Americana, al hacer primero un examen audiológico, seguido por una prueba de A.B.R.

La testigo reconoció el Audiology Desk Reference ("*A.D.R.*") como una publicación reconocida y aceptada en la práctica de la audiología. Dicha publicación establece que con umbrales de audición de 0 o más 25 decibeles, la necesidad de amplificación debe estar basada en el audiograma o información adicional, tales como la existencia de otras incapacidades, la ejecución del niño en el hogar y en el salón de clase. Afirmó

también que los niños en edad escolar primaria pueden tener un umbral de audición más bajo que un adulto, es decir lo que es audición normal en un adulto, puede considerarse pérdida auditiva en un niño de edad escolar debido a que las necesidades educativas y formativas del menor requieren una audición más aguda. .

Reconoció que un niño en edad escolar que presenta problemas académicos hay que darle las herramientas necesarias para resolverlos y que una pérdida auditiva mínima en un niño de esta edad tiene más impacto que una pérdida similar en un adulto.

Admitió que, según el A.D.R., un niño con pérdida auditiva leve a treinta (30) decibeles puede perder de un 25 a un 40% de la señal y que entre 35 y 40 decibeles, el niño puede perder hasta el 50% de la señal de habla y que esto puede tener un impacto negativo en la autoestima y el aprovechamiento del niño.

En el redirecto, la testigo indicó que ella estaba familiarizada con los libros que le habían sido mostrados, que ha estudiado de ellos y son parte de su currículo. Aclaró que ella no había hecho A.B.R. al menor en 1998 porque el paciente había sido muy confiable.

La apelada Bethzaida Barriera declaró que a la fecha de los hechos (1996), era ama de casa y vivía en compañía de sus dos hijos. Que su hijo tenía un historial de dolores o infecciones de oídos, razón por la cual faltaba mucho a la escuela.

Al hablar con la maestra, ésta le informó que iba a referir al menor a la enfermera escolar para un estudio de los oídos. Le dieron un referido para consulta con el apelante. El apelante le informó que el menor necesitaba audífonos. Luego de consultar con la escuela, le informaron que no había fondos disponibles para la compra de dicho equipo. Entonces acudió al Departamento de la Familia y éstos le dieron el dinero.

El menor usó dos pares de audífonos. El primer par le causó unas llaguitas en el oído, por lo que los tuvo que cambiar. El niño usó los audífonos intermitentemente por tres meses y luego de tres meses no los volvió a usar. Lo llevó al audiólogo José Mercado en el Hospital de Distrito, porque el menor tenía problemas con los audífonos. Luego de evaluar al menor, el audiólogo Mercado le indicó que necesitaba ver los resultados de los exámenes hechos por el apelante. Además, le recomendó buscar una segunda opinión y refirió al menor al psicólogo.

La testigo indicó que mientras el niño usó los audífonos tuvo molestias con su audición y su conducta en el hogar empeoró. Peleaba con su hermana y se quejaba de que oía ruidos a través de los audífonos.

Durante el contrainterrogatorio admitió que el niño había sido evaluado por el psicólogo en varias ocasiones durante el 1997. El informe psicológico rendido el 7 de marzo de 1997, no hacía referencia a que el niño tuviera molestias y/o problemas con los audífonos.

Por su parte, el audiólogo José Mercado Zayas testificó que ha ejercido la audiología durante diecisiete años. Actualmente, se desempeña en el Centro Pediátrico de Ponce.

El testigo declaró que había atendido al menor apelado en varias ocasiones. La primera vez que lo vio fue el 16 de mayo de 1996. En esa ocasión no se le indicó que el menor estuviera bajo cuidado de otro audiólogo. Le hizo pruebas al menor de tonos puros para detectar niveles de audición y pruebas de timpanometría para detectar problemas del oído medio. Los resultados de dichas pruebas indicaron que el menor tenía una audición dentro de los límites normales en ambos oídos. No obstante, los resultados obtenidos no resultaron confiables, por lo que recomendó se reevaluara al niño en tres meses y que se le realizara una evaluación psicológica del menor.

La evaluación psicológica la recomendó porque de acuerdo a su experiencia las respuestas que estaba dando el menor le hicieron pensar que podía haber algún factor psicológico que pudiera estar afectando la confiabilidad de los resultados. El niño faltó a la cita de seguimiento que se le dio para agosto de 1996 y luego acudió nuevamente en enero de 1997.

En enero de 1997, el menor llegó usando unos audífonos que alguien más le había recetado. El le pidió a la mamá que regresara con los resultados de los exámenes anteriores que se le habían hecho al menor.

El paciente regresó a los dos días. En ese momento, los resultados de las pruebas subjetivas también fueron inconsistentes, reflejando una pérdida moderada en la audición. Sin embargo, utilizando otros métodos o técnicas de análisis, el menor reflejó unos niveles de audición mucho mejores.

Ante el cuadro inconsistente del menor, recomendó que se le hiciera una prueba objetiva de A.B.R., que es una prueba de carácter diferencial que mide los impulsos nerviosos. Recuerda que se hizo la prueba y que los resultados de la misma demostraron unos niveles de audición de treinta decibeles. Esto se considera una pérdida de audición leve.

Se le mostró la prueba de A.B.R. realizada por el apelante el 29 de abril de 1996. El testigo explicó que esta prueba busca la presencia de la onda quinta la cual determina los niveles de audición. Que según las gráficas del A.B.R. en este caso, la onda quinta o umbral de audición se encontró a treinta (30) decibeles en ambos oídos, lo que demuestra una pérdida de audición leve.

El testigo indicó que en enero de 1997, el menor estaba usando unos audífonos marca Phonac modelo Pico CS. El conoce este equipo porque es el que receta en el Centro Pediátrico para los pacientes que presentan este tipo de pérdida de audición. El mismo está diseñado para pérdida de audición leve y no es un equipo de amplificación potente.

Durante el contrainterrogatorio, el testigo expresó que el A.B.R. que se le había hecho al menor era sumamente confiable por ser una prueba objetiva. El no lo realizó porque no tenía el equipo necesario para llevar a cabo un A.B.R.

El testigo declaró que, basándose en su experiencia y su forma de tratar pérdida auditiva, en el caso del menor apelado, él no hubiera recomendado como primera opción el uso de amplificación. Aclaró que el uso de amplificación en casos de pérdida leve está fundada en parte en las diferentes escuelas o criterios profesionales al momento de atacar una pérdida auditiva de esa naturaleza. Existen diferentes teorías profesionales para el uso de amplificación.

En su práctica particular, utiliza dos criterios para recetar audífonos a pacientes con pérdida auditiva leve, el económico y el estético. Considera el factor económico debido a la disponibilidad limitada de fondos para la compra de dicho equipo; si hay alternativas, entiende que deben reservarse los fondos diponibles para casos de pérdida más agudos.

También considera el factor estético, debido que existen personas con pérdida leve que no están dispuestas a utilizar equipo de amplificación por razones estéticas y honestamente se lo hacen saber al audiólogo.

En este caso, el apelante podía haber basado su determinación de amplificar en el concepto de pérdida de audición mínima para concluir que con dicha pérdida se debía amplificar. La madre del menor le indicó que el audiólogo Rafael Crespo fue quien recetó los audífonos. El le recomendó a ella que le realizara otro A.B.R. para verificar si el menor efectivamente presentaba pérdida auditiva y necesitaba el uso de los audífonos. No sabe si esa otra prueba se hizo porque el menor no volvió a su oficina. Le recomendó que hasta tanto no se hiciera una

nueva prueba, no usara los audífonos.

Cuando se le presentaron al testigo los resultados de las pruebas realizadas al menor en 1996 por el apelante, el testigo observó que los resultados del audiograma reflejaban una pérdida de moderada a severa. Esta pérdida significaba que la capacidad del menor para escuchar estaba significativamente reducida. Con dicha pérdida, el niño no podría escuchar una conversación a niveles normales, tendría que hablársele en tono más alto que lo normal y en el aprovechamiento académico estaría ejecutando pobremente.

El testigo aclaró que pérdida leve es una pérdida menor en que la persona sí puede escuchar el habla, puede trabajar y puede funcionar adecuadamente. Esta pérdida puede pasar desapercibida. Opinó que los resultados de las pruebas y el diagnóstico hecho por el apelante eran compatibles

Los resultados del ABR reflejaban niveles de audición a treinta (30) decibeles, lo que significa pérdida de audición leve en ambos oídos. Los resultados de la prueba básica y los del A.B.R. no eran compatibles, pero ello podía responder a que a veces los pacientes no son confiables debido a alguna condición mental o emocional que no le permita responder a la prueba objetiva de manera confiable. Que la edad es un factor a considerar en la confiabilidad del paciente. Si se quiere descartar algún tipo de patología, se recomienda el uso del A.B.R. que es una prueba objetiva para saber efectivamente cuáles son los niveles de audición.

Cuando examinó al menor en 1997, lo vio usando los audífonos Phonac Pico CS. No recuerda que ni la demandante ni el menor le expresaran satisfacción o insatisfacción con el uso del equipo.

Dentro de la práctica de la profesión, luego de una prueba básica, se utiliza el A.B.R. para confirmar pérdida auditiva o encontrar la pérdida auditiva real. El ABR realizado al menor en 1996, reflejó una pérdida auditiva leve en ambos oídos. Que según la tercera edición del libro *Hearing in Children,* utilizado como texto de audiología, una pérdida de audición mínima en un niño puede ser factor para el aprovechamiento o ejecución de ese niño. En un niño se define pérdida auditiva como cualquier grado de pérdida que reduce la inteligibilidad del mensaje de habla a tal grado que lo hace inadecuado para el aprendizaje.

El menor, en este caso, presentaba una pérdida auditiva leve a treinta (30) decibeles. De acuerdo al concepto de pérdida de audición mínima, hasta diez (10) decibeles de pérdida puede ser significativo en el aprendizaje.

En los adultos y en los niños, el concepto de pérdida de audición es diferente. De acuerdo al texto citado, el umbral de audición normal para un adulto puede ser 25 decibeles, mientras que para un niño el umbral de audición normal puede ser quince (15) decibeles.

De acuerdo al concepto de pérdida mínima y por sus necesidades de desarrollo, un niño con umbrales de audición mínimos por encima de quince (15) decibeles, presenta pérdida de audición.

En 1996, cuando por primera vez vio al menor, los resultados del examen auditivo fueron *"border line normal"* o veinticinco (25) decibeles, razón por la cual le recomendó darle seguimiento en tres meses y que lo evaluara un psicólogo. En ese momento, de la información ofrecida por el paciente y/o su madre, era muy prematuro para colocar al menor dentro de la definición de pérdida mínima.

Para la visita que el menor hizo a su oficina en 1997, cuando ya utilizaba el equipo de amplificación, no tenía información suficiente sobre la pérdida que sufría el menor y por eso lo envió a repetir el A.B.R.

El apelante declaró que tiene licencia para la práctica de la audiología en Puerto Rico y en el estado de la Florida. En 1996, poseía la Certificación de la Junta Examinadora de Audiólogos al igual que al presente.

Conoció al menor apelado cuando le fue referido a través del Progrma Título I.de la Escuela Jaime L. Drew, ya que él atiende a niños de la región educativa de Ponce en virtud de un contrato con el Departamento de Educación. De inicio, le hizo una evaluación audiologica básica al menor, compuesta de cuatro elementos: prueba de tonos puros, de habla, de impedancia y de timpanometría y reflejos acústicos. Esta reflejó una pérdida de moderada a severa en ambos oídos, de tipo sensorineural. El examen no fue muy confiable debido a que en ocasiones el niño no respondía de la forma esperada. Entendió necesario realizar una prueba de A.B.R., que no está basada en conducta, sino que es de carácter electrofisiológico. El propósito de esta prueba era verificar o corroborar el umbral de audición del menor.

De los diez o quince niños que le habían referido de la escuela del menor, no había amplificado a ninguno.

En el caso del menor apelado, la prueba de A.B.R. reflejó una pérdida auditiva de treinta (30) decibeles que, por definición, es una pérdida auditiva leve. Esta definición la da el American National Standard Institute ("A. N.S.I."), que es el instituto que se encarga de estandarizar todas las medidas y una de esas medidas es de audición.

En un menor, se considera pérdida auditiva toda aquella pérdida que es incapacitante para el adecuado desarrollo del menor tanto en lo académico como en lo funcional. El grado menor de pérdida autidiva se denomina pérdida auditiva mínima. El testigo explicó en forma de gráfica que en el caso de los menores, la pérdida auditiva de 0 a 15 decibeles se considera audición normal; entre 15 y 30 decibeles, se considera pérdida mínima; de 30 a 45, se considera perdida leve; de 45 a 60, se considera pérdida moderada; de 60 a 90, se considera severa y de 90 en adelante se considera pérdida profunda.

No obstante, en los adultos de 0 a 25, es audición normal; de 25 a 40, es pérdida leve; de 40 a 60, es pérdida moderada y de 60 en adelante es pérdida profunda.

La distinción responde a que en el caso de los niños, por encontrarse en un proceso de formación, hay que proveerle la mayor capacidad de audición posible para que ellos entiendan. El apelante declaró que los estudios revelan que un porciento grande de fracasos de niños en la escuela se debe a que éstos presentan un umbral de audición entre 15 y 30 decibeles, que se considera normal para un adulto, por lo que no son atendidos.

En vista de ello, se ha creado la teoría de *"Minimal Hearing Loss"* o pérdida auditiva mínima. Tomando en cuenta el historial del menor y los resultados de los exámenes, él entendió que debía amplificarse al menor y así se lo recomendó a la mamá de éste.

Posteriormente, la madre acudió a la oficina nuevamente a solicitar cotizaciones para los audífonos. Le informó los resultados a la enfermera de Título I de la escuela. Le comunicó que el niño tenía pérdida auditiva leve, lo que no era totalmente incapacitante, pero que podía afectar el desempeño del niño en la escuela.

Luego de aproximadamente cinco (5) meses, la madre llamó a la oficina para informar que del Departamento de la Familia le habían asignado los fondos para la compra de los audífonos. Se mandaron a hacer y se le entregaron. A la semana de estar usando los audífonos, la madre solicitó que se los cambiaran. El se los cambió por hacerle el favor. Ambos equipos utilizados por el niño están diseñados para una pérdida auditiva leve. El segundo par de audífonos está provisto de unos filtros de compresión que atenúan los ruidos de fondo y la voz de la persona que habla se oye más clara.

Al recomendar amplificar al menor, tomó en consideración el cuadro educativo, los problemas psicológicos y emocionales y la pérdida auditiva y entendió que el menor podía beneficiarse de la amplificación. Junto con los audífonos se le entregó al menor un libro de instrucciones, se le orientó sobre el uso y cuidado del mismo y se le dio una cita de seguimiento para quince días.

Los apelados no acudieron a la cita de seguimiento. Volvieron a la oficina en marzo de 1997 porque el audífono derecho estaba dañado. El equipo se le envió a reparar. En esa visita, la madre del menor le expresó que estaba satisfecha con el mismo y que el menor había mejorado sus notas y que, sobre todo, su lapso de atención en la escuela había mejorado.

El equipo está diseñado para enviar un estímulo máximo de 45 decibeles independientemente de la cantidad de decibeles que se originen. Por ejemplo, de producirse un sonido de 90 decibeles, el equipo recoge ese sonido, pero sólo reproduce un máximo de 45 decibeles.

El apelante reconoció que el equipo puede causar molestias iniciales de adaptación típicas a un equipo que es extraño al cuerpo, muy similar a las molestias que producen los espejuelos en el tabique de la nariz y sobre las orejas cuando se usan inicialmente.

Durante el contrainterrogatorio declaró que la audición del niño estaba en un área gris conocida como *"Minimal Hearing Loss"*. Con esa pérdida, en el caso de un adulto, la decisión de si amplifica o no sería del adulto. En un niño, se tiende a preferir la amplificación debido a las necesidades auditivas relacionadas con el desarrollo académico y social de ese niño.

Según la pérdida auditiva que presentada el menor en 1996, éste podía amplificarse o no amplificarse. Recomendó amplificar al menor siguiendo los estatutos de la Academia de Audiología de los Estados Unidos que recogen la teoría de Minimal Hearing Loss in Children y que expresan que niños con una pérdida mayor a los quince (15) decibeles se deben amplificar porque el rezago académico a largo plazo puede ser muy perjudicial para el desarrollo prospectivo del menor. Dicha recomendación se basó en las necesidades del menor relacionadas con los problemas de desempeño académico, los problemas de períodos cortos de atención y los problemas en el hogar y porque se ha reconocido que amplificar mejora lo que se conoce como el *"signal-to-noise ratio"* o la relación entre ruido y mensaje. Lo que se buscaba era que ese niño recibiera el mensaje del maestro lo más claro posible y que se pudiera compensar el mismo y llevarlo a unas condiciones similares a las de un niño con audición normal.

El apelante no interviene en la fabricación del equipo que se le recetó al menor. Tiene relación comercial con el fabricante. El mantiene dos controles de calidad sobre el equipo: el primero son las especificaciones que trae el equipo de la fábrica, el cual se conecta a una computadora y ésta recoge los valores que trae el equipo y verifica si realmente el equipo cumple con dichas especificaciones. El segundo es un equipo que él tiene en su consultorio que se llama *"real ear measurements"* que verifica el funcionamiento del equipo.

El testigo indicó que estaba seguro que el equipo no podía causar ruidos, por la hoja de especificaciones que traía el equipo de fábrica y por las pruebas que él le hizo.

Al menor se le dieron instrucciones y se orientó sobre el uso y cuidado del equipo. La decisión de amplificar al niño la tomó la madre, basada en la recomendación que hiciera el demandado. La recomendación del apelante se basó en el cuadro completo de circunstancias que presentaba el menor, historial de problemas con los oídos, problemas académicos y lapsos cortos de atención.

A base de la prueba desfilada, el 7 de junio de 2001, el Tribunal de Primera Instancia emitió la sentencia apelada, declarando con lugar la demanda.

En su sentencia, el Tribunal concluyó que el apelante no había ejercitado el debido cuidado al recomendar al menor el uso de audífonos, lo que le había provocado contratiempos, molestias, sufrimientos y angustias mentales a los apelados. El tribunal condenó a los apelantes a pagar de forma solidaria, $9,000.00 por daños físicos y emocionales al menor apelado, $2,000.00 por angustias mentales a la madre de éste, y $1,000.00 por el

mismo concepto a su hermana.

Insatisfechos, los apelantes acudieron ante este Tribunal.

### III

En su recurso, los apelantes plantean que la determinación del Tribunal de imponer responsabilidad al apelante no está sostenida por la prueba.

Según se conoce, en nuestra jurisdicción, la responsabilidad civil resultante de actos u omisiones culposas o negligentes está regida por el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Dicho precepto establece que el que por acción u omisión cause daño a otro, mediante culpa o negligencia, viene obligado a reparar el daño causado. El artículo añade que la imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización.

El Tribunal Supremo de Puerto Rico ha aclarado que para que exista responsabilidad bajo dicho precepto, es necesario que concurran los siguientes elementos: (1) un daño, (2) una acción u omisión negligente y (3) la relación causal entre el daño y la conducta culposa o negligente. *Montalvo v. Cruz,* 144 D.P.R. 748, 755 (1998); *Toro Aponte v. E.L.A.,* 142 D.P.R. 464, 473 (1997); *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 294, 308 (1990).

La culpa o negligencia consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación, correspondiendo tal diligencia a las circunstancias de las personas, del tiempo y del lugar. La diligencia exigible en estos casos es la que correspondería ejercitar a un buen padre de familia o un hombre prudente y razonable. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 473; *Elba A.B.M. v. U.P.R.,* 125 D.P.R. a la pág. 309.

El deber de cuidado impone tanto la obligación de anticipar, como la de evitar, la ocurrencia de daños cuya probabilidad es razonablemente previsible, y no se limita a anticipar solamente el riesgo preciso o las consecuencias exactas de determinada conducta. *Montalvo v. Cruz,* 144 D.P.R. a la pág. 756; *Ginés Meléndez v. Autoridad de Acueductos,* 86 D.P.R. 518, 524-525 (1962). No se responde, sin embargo, por acontecimientos que no son razonablemente previsibles, es decir, por sucesos fortuitos. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 473.

Para determinar si una omisión es generadora de responsabilidad, se considera: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, y (2) si de haberse llevado a cabo el acto omitido, el daño se hubiera evitado. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 474.

En nuestro ordenamiento rige la teoría de causalidad adecuada para determinar responsabilidad por los daños bajo el citado artículo 1802. Según dicha doctrina, *"no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general".* *Montalvo v. Cruz,* 144 D.P.R. a la pág. 756; *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1974).

Si el daño se debe a la conducta de más de una persona, todos responden civilmente ante el perjudicado, como cocausantes del daño, de acuerdo a sus respectivas culpas. Dichos cocausantes del daño son responsables solidariamente frente al perjudicado, sin perjuicio de que en la relación interna entre ellos la obligación se divida de acuerdo a la proporción en que la culpa o negligencia de cada uno contribuyó a la ocurrencia del daño. *Torres Ortiz v. E.L.A.,* 136 D.P.R. 556, 564-565 (1994); *Sánchez Rodríguez v. López Jiménez,* 118 D.P.R. 701, 705-706, n. 2 (1987); *Ramos v. Caparra Dairy, Inc.,* 116 D.P.R. 60, 62-64 (1985).

En cuanto al grado de diligencia que deben observar los profesionales de la salud, el Tribunal Supremo ha establecido que los mismos están obligados a seguir las normas mínimas de cuidado, conocimiento y destrezas del *"profesional razonable"*. El contenido de esta obligación queda delimitado conforme al estado de

conocimiento y práctica prevaleciente, que satisface las exigencias generalmente reconocidas por la referida profesión, a la luz de los modernos medios de comunicación y enseñanza. *Castro Ortiz v. Mun. de Carolina*, 134 D.P.R. 783, 793 (1994); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 384-385 (1988); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521-522 (1980); *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973); véase, además, *Colón Prieto v. Géigel*, 115 D.P.R. 232, 239-240 (1984).

Para establecer un caso *prima facie* contra un profesional de la salud, el demandante viene obligado a: (1) presentar prueba sobre las normas mínimas de conocimiento y cuidado aplicables al área en cuestión, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa del daño sufrido por el paciente. Véanse, *Blás v. Hosp. Guadalupe*, 146 D.P.R. 267, 322 (1998); *Santiago Otero v. Méndez*, 135 D.P.R. 540, 549 (1994); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 650 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 385 (1988); *Matos v. Adm. Serv. Médicos de P.R.*, 118 D.P.R. 567, 569 (1987).

Existe una presunción de que un profesional de la salud ha observado un grado razonable de cuidado y atención en la administración de tratamiento y que los exámenes practicados al paciente han sido adecuados. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito, es insuficiente, de por sí, para derrotar dicha presunción. Corresponde a la parte demandante controvertir la misma con prueba que demuestre algo más que la mera posibilidad de que el daño se debió al incumplimiento por parte del demandado de su obligación profesional. La relación de causalidad no puede establecerse a base de meras especulaciones o conjeturas, sino que, al igual que en todo caso civil, por preponderancia de la prueba. Si la evidencia señala a la existencia de múltiples causas del daño, no puede imponérsele responsabilidad al profesional de la salud, a menos que del conjunto de la evidencia surja que con mayor probabilidad la actuación negligente fue la causa del daño. Véanse, *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 322; *Ramos, Escobales v. García, González*, 134 D.P.R. 969, 976 (1993); *Rodríguez Crespo v. Hernández*, 121 D.P.R. a la pág. 650; *Viuda de López v. E.L. A.*, 104 D.P.R. 178, 183 (1975).

A los médicos y otros profesionales de la salud se les reconoce una amplia discreción profesional en su trabajo. No existe responsabilidad por impericia cuando el demandado se enfrenta a una situación en la cual cabe una duda educada y razonable sobre el curso de tratamiento a seguir. El error de juicio es oponible como defensa, siempre y cuando el profesional de la salud hubiese efectuado esfuerzos concienzudos para enterarse y cerciorarse de los síntomas y de la condición del paciente, agotando los medios de diagnóstico a su disposición y cuando las autoridades están divididas sobre el curso a seguir. *Santiago Otero v. Méndez*, 135 D.P.R. a las págs. 549-550; *Ramos, Escobales v. García, González*, 134 D.P.R. a la pág. 975; *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 729-730 (1983); *Oliveros v. Abréu*, 101 D.P. R. a la pág. 228; véase, además, *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 296.

De ordinario, lo que constituye o no una práctica profesional adecuada en un caso de impericia, debe ser establecido mediante testimonio pericial. Véanse, *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 828-829 (1987); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 877 (1972); *Guzmán v. Silén*, 86 D.P.R. 532, 538 (1962). No corresponde a los tribunales prescribir tratamientos de salud. Véanse, *Ríos Ruiz v. Mark*, 119 D.P.R. a la pág. 821; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. a la pág. 736.

En la evaluación de este tipo de prueba, el tribunal apelativo está el la misma posición que el juzgador de primera instancia. *Ramos, Escobales v. García, González*, 134 D.P.R. a la pág. 976; *Ríos Ruiz v. Mark*, 119 D.P. R. a la pág. 820; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. a la pág. 721; véanse, además, *Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico*, 150 D.P.R. ___ (2000), **2000 J.T.S. 67**, a la pág. 934; *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935, 952 (1997).

En el presente caso, según hemos visto, el Tribunal de Primera Instancia determinó que el apelante había

incumplido el deber de cuidado que le imponía su profesión de audiólogo, al haber recomendado innecesariamente que se le pusieran audífonos al menor.

Creemos, sin embargo, que esta conclusión no está apoyada por la evidencia desfilada. Lo cierto es que la prueba objetiva de A.B.R. realizada al menor reflejaba que éste padecía de una pérdida leve de audición, dentro de los treinta (30) decibeles.

La parte apelada no presentó evidencia alguna para controvertir dicha prueba o para sugerir que la misma había sido realizada de forma incorrecta. De acuerdo a la misma, sin embargo, la utilización del equipo de amplificación resultaba ser una alternativa admitida profesionalmente, existiendo más bien una diferencia de criterio entre distintas escuelas de pensamiento sobre si dicha alternativa debía ser utilizada o no.

Reconocemos que los otros audiólogos que declararon en el juicio testificaron que ellos no hubieran recomendado la utilización de audífonos para el apelado, en vista de que su condición era leve. Pero se trata, más bien, de una cuestión de criterio profesional sobre la cual distintos audiólogos podían diferir.

Las autoridades citadas por el apelante, las cuales fueron reconocidas por los otros peritos, claramente establecen un parámetro de 30 decibeles para fijar una pérdida leve de audición.

Cabe señalar que tanto el apelante como el audiólogo Mercado relataron que la pruebas de audiología habían arrojado resultados que ellos entendían no eran confiables, por lo que ambos recomendaron que debía realizarse una prueba objetiva de A.B.R. al menor. Mercado recomendó, además, que se hiciera una evaluación psicológica al niño.

Esta falta de precisión sirve para explicar la diferencia entre los hallazgos del apelante y de la audióloga Rodríguez Albertorio, quien encontró que la audición del niño era normal. Dicha perito, sin embargo, no llegó a realizar la prueba de A.B.R.

Cabe señalar que, conforme a la prueba desfilada, el menor estaba experimentando problemas en la escuela, lo que tendía a respaldar la recomendación del apelante.

Habiendo realizado los exámenes apropiados para llegar a su recomendación, no pensamos que quepa imponer responsabilidad al apelante por haber seguido un curso de tratamiento más agresivo, pero admitido por las autoridades médicas, que el de los otros audiólogos consultados. *Santiago Otero v. Méndez,* 135 D.P.R. a las págs. 549-550; *Ramos, Escobales v. García, González,* 134 D.P.R. a la pág. 975; *Cruz v. Centro Médico de P. R.,* 113 D.P.R. a las págs. 729-730; *Oliveros v. Abréu,* 101 D.P.R. a la pág. 228.

La responsabilidad en este tipo de casos, según hemos visto, está predicada en que el demandado se hubiera apartado de las normas aceptadas de su profesión, no en una discrepancia de opinión sobre el curso a seguir, basada en distintos enfoques de la profesión.

Reconocemos que el menor se quejó sobre los inconvenientes que le ocasionaba la utilización de los audífonos. Ante la levedad de su condición, es posible que los mismos realmente no le hubieran ayudado en el grado que estimaba el apelante. Pero ello no quiere decir, sin embargo, que desde el punto de vista de la mejor práctica de la audiología, su utilización hubiera estado contraindicada. La propia perito de los apelados testificó que este equipo no había ocasionado daño alguno al menor.

Aunque las determinaciones de la ilustrada Sala apelada nos merecen deferencia, no por ello venimos obligados a siempre sostener las mismas, cuando consideramos que no representan el balance más razonable y justiciero de la prueba. El arbitrio de dicho juzgador no puede entenderse inmune a la función revisora de este

Tribunal. Véanse, *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 545 (1984); *Vda. de Morales v. De Jesús Toro,* 107 D.P.R. 826, 829 (1978).

En la situación de autos, entendemos que la prueba desfilada fue insuficiente para sostener la imposición de responsabilidad al apelante.

Por los fundamentos expresados, se revoca la sentencia apelada. En su lugar, se desestima la demanda.

Lo pronunció y manda el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIO 2002 DTA 120**

**1.** Se trataba de una amplificadores marca GN Danavox, modelo Escort, los que eran distribuidos de forma exclusiva por el apelante.